PAUL R. MUENCH, Appellee, v. A. G. BARNELL, Appellant.

Specific performance:   FRAUD:   EVIDENCE.   Specific performance of a
    contract for the sale or exchange of real property cannot be de-
    manded as a matter of strict right.   It is only granted in the exer-
    cise of a sound discretion and upon clear and satisfactory evidence,
    and where the contract itself is fair and was fairly procured.   In
    the instant case the evidence is held to show that the signature
    of defendant was obtained by unfair means, and that the contract
    of exchange itself was unjust and unfair and should not be en-
    forced.

*Appeal from Linn District Court.*—HON. MILO P. SMITH,
                    Judge.

MONDAY, DECEMBER 15, 1913.

SUIT in equity for specific performance.   There was a
decree for the plaintiff, and defendant appeals.—*Reversed.*

*Redmond & Stewart,* for appellant.

*Geo. F. Buresh* and *Randall, Courtney & Harding,* for
appellee.

EVANS, J.—At the time of the transaction herein involved
the plaintiff was in the real estate business and connected
with the firm of Bolton & Co., of Cedar Rapids.   Some time
in the first half of the year 1911 the defendant sought the
assistance of said company to find a purchaser for four hun-
dred and seven acres of land owned by him in Crow Wing
county, Minn.   The plaintiff, Muench, alone represented Bol-
ton & Co. in the negotiations with defendant which extended
over some weeks of time.   The defendant was willing to trade
for Cedar Rapids property.   Various trades were suggested
by Muench; but nothing definite was proposed or done.   In
the course of the negotiations, Muench told defendant, Bar-
nell, that there was a man in Cedar Rapids who owned a
quarter section of land in Oklahoma, which was worth $50 an
acre, but which could be had for $45 per acre, and that he
would try to interest such person in a trade with the defend-
ant.   Upon later inquiries by Barnell, Muench reported that
he had been unable to get such person interested in the deal.
He proposed to Barnell that he sign a written proposal, and
place the same in his hands, in order that he might use the
same for the purpose of interesting the owner of the Okla-
homa land in the proposed trade.   Muench prepared such
paper, and Barnell signed it under certain oral conditions
which will appear in the testimony hereafter quoted.   The
following is a copy of such writing:

VOL. 163 IA.—23

Cedar Rapids, Iowa, July 8, 1911.

To Malcolm V. Bolton & Co., Agents. I hereby offer to exchange 407 acres in Crow Wing county, Minnesota, more particularly described as follows: [Here follows correct description], free and clear of all liens and incumbrances except one-half of the mineral rights now on such land, for the following described property: One hundred and sixty acres in Comanche county, Oklahoma, legally described as follows: [Here follows correct description], incl. the share of the owner's crop for 1911 as per lease. The above Oklahoma land is subject to a mortgage of $2,000 due in the spring of 1916, and a second mortgage of $200 due in the spring of 1912, and an oil lease now on the land; both mortgages bearing interest at six per cent., which I hereby agree to assume and pay, with interest thereon, from date of transfer. Each party to furnish a warranty deed to their respective properties, accompanied by a complete abstract of title from the U. S. government down to the date of transfer, free and clear of all liens and incumbrances except as shown above. Transfer to be made on or before August 1, 1911. I hereby tender $—— on the above exchange subject to the acceptance of this proposition. A. G. Barnell.

Muench was himself the owner of the Oklahoma land; but such fact had been withheld from Barnell until July 25th or 26th. On July 28th Muench caused his name to be appended to an acceptance of such written proposition. The written proposition thus signed by Barnell and thus accepted by Muench is the alleged contract upon which this suit is based. The defendant denies the right of the plaintiff to use the written proposition thus delivered to him in the manner indicated, and denies that he ever entered into any contract with the plaintiff in his own interest, but dealt with him solely as a supposed agent of a third party.

The plaintiff testified in his main case that he had told the defendant that he was the owner of such land at the time the defendant signed the written proposition. He admitted, however, that he did not so tell him until about July 25th, but testified that the paper was not signed by Barnell until

about that date.  The principal dispute of fact in the testimony of the parties is upon this question.  The following is a part of Barnell's testimony:

I met Muench in 1911.  I can hardly state the exact time. I have an impression that it was in Bolton's real estate office. I think that I went in there one day the fore part of June, and spoke to some one of the firm there; I am not sure whether it was Mr. Muench or some of the others of them.  I told him that I had some Minnesota land that I would like to sell or trade for property in Cedar Rapids or near Cedar Rapids. These are the facts as near as I recall.  I am past 70.  A short time afterward I received a letter from Muench, telling me there were some parties in Cedar Rapids that had some lots there, and he thought I would be interested in them, and, if I was, he could get me a good trade, and for me to call and see him, and I did.  He told me that he had been investigating the lots; that they were quite heavily incumbered; that he didn't think they would suit me; that I would not want to trade for them—seemed to not want to press the trade—didn't think it was worth while to show them to me or anything of the kind, so the conference stopped right there.  Then he told me there was a man living in Cedar Rapids that had an Oklahoma farm.  He said he thought, if he could interest me in trading for an Oklahoma farm, that he could get me a good deal for my Minnesota land: I inquired of him about the land as best I could.  He gave me a description of it.  I asked him if he had seen the land, and he said he had seen the land.  Then I said, 'You know something about it;' and he said, 'Yes.'  He said he did; that he knew the land fairly well.  Then I inquired of him in regard to the owner, and he said he lived there in town, and was anxious to trade the land; that he would sell it or trade it for something nearer home.  I told him to see the man, and set a date for me to meet him there at his office, and we would talk it over.  He said he would.  Well, it ran along a few days, and I think I saw him two or three different times after that, and he told me that he hadn't been—hadn't succeeded in making arrangements yet with this man to meet me. He said he was busy, and he couldn't interest him enough to get him there.  I told him that, if at any time he could, I would be glad to see him, and talk with him about the trade. Our conversation dropped then at that time.  Then I saw him

a few days later, and he told me that he hadn't succeeded in getting the man to set a date; but he says, 'He is very busy,' and he says, 'I think the better thing to do—I think the proper thing to do, would be for me to—' he says, 'I have made you a proposition on the place.'

Q. What was the proposition on the place? A. Mr. Muench told me he thought this man would trade me the Oklahoma farm for my Minnesota land, if I would assume the mortgage. There was an indebtedness I think he said of $1,600.

Q. What was said about the price per acre of your land and the Oklahoma land? A. No; Mr. Muench submitted a proposition to me for his client. He said that he asked $45 an acre for his land, and asked me what I would value the Minnesota land at, and I told him $10, that I thought the land was richly worth $10, and, if we could make a deal, it would be on this basis.

Q. Go ahead, and tell the rest of it—how you came or happened to sign the paper. A. As I was saying, he said that he thought the best plan would be to draw up a little article, specifying the terms of the trade that he had mentioned to me, and then he said he would show that to the owner, and see what he said about it—he said that—he says, 'I wouldn't guarantee that he would accept of these terms; but,' he says, 'it will do no hurt to submit the terms to him in that way.' He says, 'I can get him interested, and he will think well enough of you to get a conference between you and him.' I said, 'I don't believe I would like to do that.' He said, 'Why?' I told him that signing articles in that way often got people into trouble, and I didn't think it was best to do that. He said, 'Oh, not the least danger of it in the world; it will just be a matter of business; you would know then—he would know then that you was interested in his land, and he would think favorable of it, and meet me there.' We got to talking it over, and I said, 'Well, that may be all right, because I have no doubt but what he would want to see my land, and I would want to see his, if we traded.' He said, 'Yes; no doubt that would be the case.' But he said, 'You and him for that.' After a time I told him, if he would assure me that it would not involve me in any trouble whatever, I would sign the article, and he could submit it to his man, and see what he had to say about it, to get him to meet me, and we

could talk it over. He drawed up that, and I noticed that it was the 8th of June—

Q. The 8th of July—is this Exhibit 2 the paper? A. Yes; I think that is the paper—it is July; yes. He drawed up the article, and I signed it, and left it with him, and then I saw him a time or two afterwards—I don't know just how often—and asked him if he had seen his man, and he said, 'No,' he had not. Yes; he said he had seen him, but hadn't succeeded in getting him there. Then after a time Mr. Muench called me up over the telephone, and told me to come down, that he wanted to see me, and I went to see him. I went down to his office; when I went in I supposed he had his man there. When I went in I spoke to him, and said, 'Did you see your man?' He said, 'Yes; I seen him.' I said, 'Is he to come to meet me?' 'Now,' he says, 'I want to tell you, Mr. Barnell, I own that land.' I said, 'You do?' He said, 'Yes.' I asked him why he didn't tell me that he owned it in the first place. He said—well, he wanted to wait and see. Then he said to me, 'Now, are you particular about this land—'

Q. About the trade? A. Yes; 'Are you particular about this trade?' I said, 'No; I am not; I don't care anything about it.' 'Well,' he says, 'then we will let it go for the present.' Our conversation ended there, and I went home, and I told my wife—told her that the trade was off, and I didn't think any more about it. It might have been a week from that date I learned from my wife that Mr. Tait came to my place, and had inquired for me, and what he wanted. I went down to his office the next day to see him, and I understood him to say that Muench had written him, though he may have said dispatch, to take the article and sign it, and told me to get things ready, for he had decided to trade, and I told Tait that I had never agreed to trade with him (Mr. Muench); that the deal was dropped, and I had not thought any more about it; that I didn't propose to do anything about it. He insisted on my taking the paper. I didn't know that there was more than one. Of course, if there was, it was a copy I took, and it wasn't but a few days until Mr. Muench called me up, and I went down to the office. Muench wanted to know if I was ready to close the deal, and I told him, 'No,' I was not ready to close the deal, that I had not thought anything more about the trade since the circumstance that had come up, and that I didn't intend to do anything about it, and I told him of

the letter I had received from one of the men he had given me as reference, advising me not to trade for it unless I seen it. He tried to overcome any thoughts that I had along the line of not trading on account of the deal as it had been made. Others advised me that it would not be best to trade for it without seeing it. After we had talked awhile he asked me if it didn't look reasonable that this man might have had some object in sending this letter to me. I told him that might be; but I didn't know. Well, he tried to get me to go on, and close the deal. I refused, and then he told Mr. Tait of the circumstance of my refusing to close the deal, and asked him if there was anything more he thought he could do. Mr. Tait said, 'I would suggest, if I was in the deal, that I would want a new contract.' He said, 'I would want a new contract between you two up to date, and a time set to close the deal.' Mr. Muench made that proposition to me, that we would do that. I told him I was not ready to say that I would trade for the land; that I never had seen the land, and didn't know about it. *I had told him in the first place that if I traded for this land that I should want to see the land,* and I said, 'I have no doubt but what you want to see mine.' There was nothing more done at the time. He called me up a number of times after that, and he sent me to Mr. Buresh's office. He wanted to try and convince me that it was to my interest to trade for the land without seeing it, or without knowing whether it belonged to him or not, whereas, he had represented that it belonged to another man. I refused to make the trade. At one time he called me up, and wanted to know what I was going to do about it, and I told him I had decided not to trade under the circumstances. He said, well, I had articled with him, and he had depended on the trade. 'But,' he said, 'if you don't want to trade, you don't have to,' and seemingly got a little sore about it. We parted at that time; then he called me up again, and wanted to see my abstract. I went— I was down and talked with him a number of times about it, and finally he threatened me—seemingly to me very vicious— to get me to deal with him. When I showed him the abstract, he told me I had better have the abstract brought down to date, and I told him I had intended to do that because *I expected to sell the land or trade it.* He said, 'Well, now, I'll tell you, if you send that abstract off up there, you don't know what it will cost you, and you would have to send the money

before it would be returned; you better have the company
send it; let Bolton & Co. send it; I will take the abstract, and
give you a receipt for it, and send it down, and it will be
recorded, and sent back to the company, and the bill will come
with it, and you can come in, and pay the bill, and get the
abstract.' I told him to get a receipt, and send the abstract.
He gave me a receipt for the abstract, and they took it, and
sent it. When the abstract came back, I went in, and called
for it; found what the bill was, and paid, and was told that
Mr. Muench had the abstract, and had turned it over to
Buresh. I went to see Buresh, and he told me that Muench
had turned it over to him to examine and hold; that he couldn't
give it to me. Then Mr. Buresh tried to advise me to go on
and close the deal. I told him that I was not under any obli-
gation to do it, because I never had traded with Mr. Muench,
and I wasn't going to close up the deal with him. He thought
I had better do that; he said Muench would give me trouble
if I didn't. I told him that I could not help that; that I had
never given the article; that, if he had told me he owned the
land, and we had articled, and each of us had signed it, that
would have closed it; but he didn't and he knowed it, and I
told him that I was not under obligations. He wanted to know
why. I said, 'He claimed he was agent for another man that
owned the property;' and he said—Mr. Buresh told me that
he didn't know but he had a right to do that. I told him I
couldn't see that he did; and I went and got counsel on it,
and they told me he had no right to do that. Mr. Buresh
asked me if I was going to California, and I told him I was,
and told him I had told Mr. Muench, if it would be satisfactory
with them, I would go by the land, and look at it, and, if it
was what it was represented to be, I would go on and close
the deal with him; that I had just as soon trade for the land
if it was all right, but under the circumstances I could not
do it. And on the strength of that they brought this suit
against me. This talk with Buresh was just before I started
for California, and they sued me before I started. Mr. Muench
told Buresh I was going, and he asked me. Mr. Buresh told
me it would give me a good deal of trouble, because he said,
if he commenced suit, I would have to come back here and
defend it. I told him I could not help that; that I could not
be wronged.

Q. Did he say anything to you about slipping up there

to see your land? A. No; he did not. Now, I signed the article the day it was drawn up, and Mr. Muench didn't go to look at the land until the last of July. Seemingly he went the next day after he told me that he owned the land; he states that himself, that is true. He told me the day before he went away. The article was signed when it was drawn up, about July 8th, the date of it. This article was drawn up to submit to another party.

Q. Did you ever tell Mr. Muench or anybody else that you were satisfied to trade after you found that he owned the land? A. No, sir; I never told any one. I always told him I would not trade unless I went and looked at the land, and was satisfied with it, and he seemingly didn't care to have me go.

It appears then from Barnell's testimony that the contract was signed on July 8th; Muench prepared the paper, and inserted the date. Such date corroborates Barnell's testimony. No adequate reason is suggested by Muench why it was not signed on the day of its date; the only suggestion being that Barnell was unwilling to sign on that day. Plaintiff's testimony on this subject was as follows:

Q. Now, Mr. Muench, when did you first, so far as you are now able to recollect, tell Mr. Barnell that you were the owner of this Oklahoma land which you were offering to exchange to him? A. I told Mr. Barnell that I was the owner of the land at the time the contract was signed by Mr. Barnell. Q. When did he sign this instrument? (Exhibit 2.) A. About two weeks, or a week, or ten days afterwards (July 8, 1911, date of contract)—something like that. . . .

(Cross-examination:) Q. When did you first, as nearly as you can remember, tell Mr. Barnell that you were the owner of this land? A. I don't know as I can recollect the exact date. Q. I mean with reference to the signing of this paper, or with reference to some other evidence that you have testified to relative to time? A. On or about the time the paper was signed.

There is nothing in the circumstances of the case to corroborate the plaintiff at this point. The testimony of the defendant is in accord with the date of the paper, and is consistent with the admitted circumstances of the case. The writ-

ten proposition was not directed to Muench personally, but to his real estate firm as agents. By this method the name of the real owner was concealed. If the proposition was not signed before Muench had disclosed himself as the owner of the land, there was no reason why the proposition should not have been addressed to Muench himself. The consideration of other features of this case, therefore, must proceed upon the theory that the written proposition sued on was signed and delivered on July 8th in ignorance of Muench's personal interest in the subject-matter thereof. After Barnell had testified on the trial as above set forth, the plaintiff testified in rebuttal. His only denials of the evidence of Barnell were as follows:

The contract was signed just before I went to Minnesota, along about the 24th or 25th of July. I didn't call Barnell down, or tell him at any time the deal was off. Q. Was this the first notice that you had from any person that Mr. Barnell was dissatisfied with the deal and intended to back out? A. I remember of none. Q. Did Mr. Barnell at any time say to you that he was dissatisfied with this deal on the Oklahoma land, or that he didn't consider it a deal? A. I remember of none.

Except, therefore, as to the date upon which the written proposition was signed, the testimony of Barnell as to the negotiations between him and Muench is practically undenied. It appears, therefore, that, when Muench informed Barnell that he was the owner of the Oklahoma land, the trade was verbally declared "off." Before Barnell had been informed of Muench's personal interest, Muench furnished him the names and addresses of three persons in Oklahoma to whom he could write for information. Barnell did write, and received replies. These replies stated in substance that the land was worth $50 an acre. When the written proposition was delivered to Muench as agent, he was instructed by Barnell that there was to be no trade until he could see the land. This oral instruction or condition was entirely competent as between the defendant and the agent. It will be noted that the written

proposition called for completed performance on August 1st. On July 27th the plaintiff went to Crow Wing county to see the defendant's land. He did not advise the defendant of that fact. From Crow Wing county, Minn., he telegraphed to the home office at Cedar Rapids, authorizing the witness Tait to sign his name to an acceptance of the contract. This telegram was sent after the plaintiff had ascertained the value of defendant's land to be $7 or $8 per acre, and before he had actually seen the land. He had represented his own land to be worth $45 per acre, or a total of $7,200, subject, however, to mortgages of $2,200. He knew that Barnell had not seen his land, and that he could not see it before August 1st.

It is too clear for argument that the attaching of Muench's signature to the written proposition was not sufficient to create a contract between him and Barnell. Some reliance is placed upon the subsequent conduct of Barnell as in the nature of admission or ratification. It is claimed that Barnell subsequently delivered his abstract of title to the plaintiff, and that this was done in part performance of the contract. The circumstances attending the obtaining of this abstract are related by Barnell, and they are practically undenied. These did not constitute a delivery in part performance. There was some attempted negotiation between the parties after the return of plaintiff from Minnesota. The plaintiff claimed he had a binding contract, and the defendant denied it. The defendant, however proposed to go to Oklahoma, and look at the land, with the idea that, if he found it as represented, he would still trade. He was about to go to California, and his suggestion was that he would go to see the Oklahoma land on the way. As he was about to start for California, this suit was brought.

It is a suggestive circumstance that prior to the beginning of this suit on the eve of defendant's departure no tender of deed or abstract had been made by plaintiff to defendant. No tender was pleaded in the petition as a basis for asking specific performance from the defendant. On the trial, how-

ever, a deed was brought into court, and tendered. No
abstract of title was tendered even then. Plaintiff testified
that defendant had waived an abstract of title from him, and
that in lieu thereof he had accepted an oral opinion from
plaintiff's own attorney that the title was all right. The only
reason suggested for such waiver was that an abstract would
cost the plaintiff $15. This reason is not very impressive,
and especially in view of the circumstances that the plaintiff
had procured a certification of defendant's abstract of title
at an expense to him of $20. The defendant denied any
waiver in any other sense than that he was claiming no right
or interest in the Oklahoma land, and was making no demands
in reference thereto. Such attitude was consistent with his
present contention; whereas, the failure of the plaintiff to
tender deed or abstract on or about August 1st was quite in-
consistent with his present contention.

The relief sought in this case was specific performance,
and such was the decree. The property involved being beyond
the jurisdiction of the court, the decree was aided by a coer-
cive alternative judgment for $4,070.

It is well settled that specific performance is not a matter
of strict right to a plaintiff. It is granted only in the exer-
cise of a sound discretion of the court, and granted only upon
clear and satisfactory evidence. The contract presented must
be fairly procured and fair in itself. *Harper v. Sexton,* 22
Iowa, 443; *Clark v. Maurer,* 77 Iowa, 717.

In *Brokerage Company v. Wharton,* 143 Iowa, 69, we
said: "Specific performance is at most a matter of large
and just discretion of the court. It is not a matter of strict
right to a plaintiff. *Smith v. Shepard,* 36 Iowa, 253; *Thurs-
ton v. Arnold,* 43 Iowa, 43. It is an extraordinary remedy,
and will never be awarded, unless the court can give the
approval of its conscience to the contract presented. It is
refused whenever the contract appears to the court to be un-
conscionable or inequitable. Generally speaking, any trace
of unfairness or fraud will render specific performance un-

available to plaintiff. *Throckmorton v. Davidson*, 68 Iowa, 644; *McDowell v. Caldwell*, 116 Iowa, 475; *Schneider v. Schneider*, 125 Iowa, 1.''

There is no gainsaying the fact that the possession of the contract sued on in this case was obtained in the first instance by sharp practice, and that the plaintiff has continuously sought to gain an unfair advantage over the defendant by reason of such possession. The plaintiff stands in the unenviable position of seeking to enforce a conveyance of the Minnesota land, worth from $2,800 to $3,200, in exchange for the Oklahoma land, which he undeniably represented to the defendant was worth $5,000 over and above its incumbrances. It is manifest that he did not believe his own representations, and the defendant may be justified in distrusting them.

The taint of fraud is such as to forbid relief by specific performance. We are satisfied, also, that plaintiff is not entitled to relief in any form on such contract, on the ground that the instrument sued on never became a contract between him and the defendant. The decree entered below must therefore be reversed, and the plaintiff's petition dismissed.— *Reversed.*

WEAVER, C. J., and LADD and PRESTON, JJ., concur.