NEW YORK BROKERAGE COMPANY, Appellee, v. W. C. WHARTON and ELLEN M. WHARTON, Appellants.

**Specific performance:** FALSE REPRESENTATIONS: KNOWLEDGE OF FALSITY: EVIDENCE. Where false representations as to the value of a stock of merchandise were relied upon and induced the making of a contract to exchange land therefor, it is immaterial in an action for specific performance of the contract that the party making the representations did not know them to be false. In the instant case the stock of goods was represented to be of less value than the land to be exchanged therefor, which was a material consideration with defendants, and the evidence is held to show that the party making the representations knew them to be false.

**Contracts:** IDENTITY OF PARTIES: FRAUD: RESCISSION: SPECIFIC PERFORMANCE. A party to a contract is entitled to know with whom he deals, unless he consents to deal with an agent in behalf of an undisclosed principal; and he may rely on the representations made as to the identity of the other party, and if deceived thereby may rescind the contract and defeat specific performance on that ground alone.

**Sales:** CONTRACT TO FURNISH INVOICES: WAIVER. Under a contract for the sale of a stock of goods at the invoice price, a good faith

attempt by the buyer to make an invoice from the cost marks on the goods was not a waiver of failure to furnish the original invoices, where the invoice attempted to be made was not completed and the price thus ascertained finally accepted.

**Specific performance:** SALE OF GOODS ON INVOICES: FAILURE TO PRODUCE SAME. Specific performance of a contract for the sale of goods at their invoice price will not be decreed, where the seller fails to produce the invoices, or show the actual cost otherwise than by the cost marks on the goods not shown to represent the original cost.

**Sales:** RESCISSION OF CONTRACT. Assuming that the cost marks on the goods were the same as the invoice price at which the buyer agreed to take them, the sellers attempt to invoice them at a higher price was a breach of the contract which entitled the buyer to a rescission; and having declared a rescission an assent thereto by the buyer was unnecessary.

**Specific performance.** Specific performance is not a matter of strict right but is an extraordinary remedy and should only be awarded when the contract is conscionable and equitable.

*Appeal from Keokuk District Court.*—HON. W. G. CLEMENTS, Judge.

TUESDAY, MARCH 9, 1909.

REHEARING DENIED SATURDAY, JUNE 5, 1909.

THIS is an action for specific performance. There was a decree for the plaintiff. Defendants appeal.—*Reversed.*

*Talley & Hamilton* and *J. C. Beem,* for appellants.

*Stockman & Hamilton, W. R. Lewis,* and *T. C. Lego,* for appellee.

EVANS, C. J.—Plaintiff brings this action for a specific performance of a written contract, purporting to be entered into between the plaintiff and the defendants (who

are husband and wife) on August 3, 1906. The plaintiff was the owner of a stock of goods at What Cheer. The defendant W. C. Wharton was the owner of a farm of two hundred and eighty acres in Missouri, incumbered by a mortgage of $4,000. The defendant Ellen Wharton was the owner of forty acres, being the homestead of the defendants in Keokuk County, which was incumbered by a mortgage of $1,500. By the contract in question the defendants agreed to sell the farms referred to to plaintiff at an agreed valuation of $11,000 for the two hundred and eighty acres and $3,600 for the forty acres, making the net value of defendants' equity in said farms at $9,100; and the plaintiff agreed to purchase said farms, and to pay therefor by transfer of the stock of the goods in question, to be taken by the defendants "at invoice price." In pursuance of such contract, the parties entered upon an attempted invoice of the stock of goods, and so continued for a couple of days until a controversy arose between them, which resulted in the defendants abandon-ing all further attempt at invoicing and in their abandoning the contract. The merits of this controversy we will consider later in the opinion. The plaintiff procured the invoicing to be completed, tendered such invoice and the keys to the defendants, and brought this action. The amount of such invoice is something over $12,000. The contract between the parties required the defendants to take the whole stock and pay for the difference, if any, over and above the $9,100. The defense is both negative and affirmative. Under their general denial the defendants contend that the plaintiff never performed, nor offered to perform, nor was it able to perform, the contract on its own part. Affirma-tively they aver that they were deceived by the false representations of the plaintiff, and were induced thereby to enter into the contract. These alleged false representations related chiefly to (1) the ownership of the goods; and (2) the quantity of goods in stock. They also contend that

the final abandonment of the contract was by the mutual assent of both parties. The trial court entered a decree ordering specific performance. The decree made some qualifications upon the contract which we will note later herein. We have gone through the evidence with much care and we are unable to concur in the conclusions of the trial court. On the contrary, we are impressed with the superabundance of reasons appearing in the record why specific performance should not be ordered.

I. The defendants were farmers and were without practical experience in the mercantile business. The plaintiff was represented in the transaction and in the litigation

1. SPECIFIC PER-
FORMANCE:
false repre-
sentations:
knowledge of
falsity: evi-
dence.

that followed wholly by one L. Urdangen, who was a man of practical mercantile experience, and who had the management of the stock of goods in question. There is no reasonable doubt under the evidence but that he represented to the defendants the quantity of the goods to be much less than it, in fact, was. In the negotiations it was deemed important by the defendants that they should have a margin in their favor of several hundred dollars in order that they might pay certain debts owing by them. This was stated by them to Urdangen. Urdangen assumed knowledge of the approximate amount of goods in stock. He estimated that the margin in favor of the defendants would be from $1,100 to $1,500. His final assurance was that it could not be less than $600. He stated that the stock would not run less than $7,000 nor more than $8,500. We are satisfied that the defendants relied upon his assurance, and that he knew it. Under the invoice as finally made out, the defendants would be required to pay the plaintiff $3,500, which they would be wholly unable to do. This stock was made up of remnants of old bankrupt stocks shipped in from different places. Judicial notice does not require the aid of much practical observation to know that the defendants could

never realize enough out of the stock to pay the balance found against them. For the purpose of this case, it is immaterial whether Urdangen knew of the falsity of his representation or not. *Wilcox v. University,* 32 Iowa, 367; *Mohler v. Carder,* 73 Iowa, 582; *Weise v. Grove,* 123 Iowa, 585. We are unable, however, to read this record without reaching the conclusion that Urdangen did know the falsity of his assurance. He was a man of practical experience in his line, and was in possession of the stock, and presumably knew approximately what there was in it. We think the form of the contract itself was a ruse and a false token. It provided that, if the goods invoiced less than $8,000, then the plaintiff was to be relieved of the purchase of the forty acres. This provision was incorporated apparently for the benefit of the plaintiff. If Urdangen knew, as we find that he did, that the stock would not invoice less than $8,000, there was no occasion for incorporating such provision in the contract, except to confirm the impression upon the minds of the defendants that there was such a possibility. This form of contract has become too familiar to the courts of late years. Its operation is always uniform. Too seldom do the parties to it deal on equal terms; too often, as here, the victim of the transaction finds himself confronted by his own agent as an adverse witness. It is also claimed by the defendants that a large number of drawers which were represented to be empty when they looked over the stock prior to the purchase were found at the time of the invoice to be full of goods. We think this complaint is fairly sustained.

II. As already indicated, the business with the defendants was transacted by L. Urdangen alone. Defendants did not know that any other person had any interest in the goods. They claim that Urdangen stated to them that he owned the goods, and that he had no partner. All his conversations in the negotiations preceding the con-

2. CONTRACTS: identity of parties: fraud: rescission: specific performance.

tract would indicate nothing else than that he was acting in his own behalf. We think the circumstances corroborate the testimony on behalf of the defendants that he did represent himself as the owner of the goods. There is no reasonable doubt but what the defendants so believed. It is true that the contract was signed "New York Brokerage Company," but, in view of his previous statements, the defendants were justified in believing that he was doing business under that name. On the trial Urdangen testified that the New York Brokerage Company was a partnership composed of Ida Urdangen and Liebsohn Bros., of Grundy Center, and that he himself was the "manager." This being true, Urdangen was not a party to the contract at all. The real parties to the contract were persons never disclosed to the defendants. It is argued that this was not a material fact, and that misrepresentation with reference to it furnishes no ground of complaint. We think otherwise. It is the right of a party to a contract to know with whom he deals unless he consents to deal with an agent in behalf of an undisclosed principal. He has a right to rely upon representations made as to the identity of the other party to the contract, and, if deceived by such representations, he has a right to rescind. *Ellsworth v. Randall,* 78 Iowa, 141; *Rodliff v. Dallinger,* 141 Mass. 1 (4 N. E. 805, 55 Am. Rep. 439); *Fox v. Tabel,* 66 Conn. 397 (34 Atl. 101). All the conversation and conduct of Urdangen, both before the contract was signed and afterwards, and while an invoice was attempted would indicate that he regarded himself as the owner of the goods. Under the showing made in his testimony, he incurred no liability whatever in the signing of such contract, but simply undertook to bind other persons who were wholly unknown to the defendants. We think the defendants were entitled to resist specific performance upon this ground, if there were no other.

III. Inasmuch as no other person than Urdangen

has had to do with the transaction on behalf of the plaintiff, it will be more convenient for us to refer to him as plaintiff in the further discussion of the case. The parties entered upon an attempted invoice of the goods on the 4th day of August. The cipher to the cost mark was given to the defendants, assistance was called in, and the work was undertaken. Occasionally disputes arose between the parties over the cost marks. Some cost marks were difficult to decipher. Some goods had no cost mark. The defendants asked for invoices, but were informed by the plaintiff that he had none. He claimed to have destroyed the bills even of his most recent purchases, because he claimed to have no need for them after putting the cost mark upon the goods. Notwithstanding this fact, the defendants continued in what seems to us a good faith effort to invoice the goods. A dispute arose over some darning cotton. The plaintiff put it into the invoice at a price to which the defendants objected as being greater than the retail price. They discovered, also, that it was greater than the cost mark on the box, and called plaintiff's attention to that fact. He insisted there was a mistake in the cost mark, and adhered to his price. The defendants refused to proceed further unless the plaintiff should recede from his position. Upon his further refusal, Mrs. Wharton said, "Then the deal is off," to which plaintiff replied, "It is just as you say." Thereupon the defendants gave up their invoice books, and left the store. That this circumstance occurred is not in serious dispute, although the plaintiff in his testimony qualifies the form and effect of it. The final language which we have quoted is in accord with the testimony of Silk, the plaintiff's witness. He only qualifies it with a statement that some time later Mrs. Wharton said: "I suppose he will sue us for damages." On the trial it appeared from the testimony of plaintiff, not only that he had no invoice bills of any of the goods, but that the cost marks thereon did not repre-

sent the cost of the goods to him. His stock was made up of remnant bankrupt stocks, brought together from different sources, and usually bought by him in lump for a lump sum. He testified that he copied the cost marks which he found on the goods and re-entered them in his own cipher, and these were the cost marks upon which the attempted invoice was made.

The contract called for the goods to be taken "at invoice price"; but he had no invoice. The trial court appears to have been of the opinion that the invoices were waived by the defendants when they proceeded to invoice without them. If they had completed the invoice and had accepted the final price, this would undoubtedly be true; but the mere fact that they attempted in good faith to invoice the goods upon the cost marks ought not in our judgment to be regarded as a waiver of the invoice until the defendants could have an opportunity to know what the cost marks on the whole stock would show. We see no reason why as a matter of convenience they might not have proceeded in accordance with the cost mark, and yet required that they be verified by the invoices or duplicates, if they were dissatisfied with the cost marks. When it was developed further by the evidence of the plaintiff that the cost marks which he held out to these defendants were not cost marks at all, and did not represent the cost of the goods to him, and that he had no knowledge as to whether they represented the original cost of the goods to anybody, except the mere fact that they were copies of alleged cost marks which he found upon the goods, it left no ground upon which plaintiff could stand to ask for specific performance. The only performance possible was on a basis outside of the terms of the contract. And, if this were not sufficient difficulty, further trouble was furnished in the fact that many of the goods had no cost marks at all.

The decree of the court appointed a commissioner to

take the invoice according to the cost marks, where the cost mark appeared, and according to the wholesale value if no cost mark appeared. The inability of the plaintiff to produce any invoices or to show the actual cost of the goods presented on the face of it a want of mutuality. The defendants could not have compelled him to produce invoices which he did not have or to show the cost which he did not know, and therefore they could not have had specific performance. This fact is entitled to consideration as against the allowance of this remedy. *Luse v. Deitz,* 46 Iowa, 205.

*4. SPECIFIC PERFORMANCE: sale of goods on invoices: failure to produce same.*

Referring now to the final dispute between the parties, the plaintiff was clearly in the wrong. If we should assume as the plaintiff necessarily does that the cost mark on the goods was the equivalent of the "invoice price," then cost mark it must be. What right then did the plaintiff have to put goods into the invoices at a greater price than his cost mark? What right had he to say that the cost mark was too low? We see no escape from the conclusion that this conduct on the part of the plaintiff was a breach of the contract then and there, and furnished sufficient ground for the rescission of it by the defendants. They did declare a rescission. Whether plaintiff by his language really intended to assent to such rescission or whether the defendants understood him as so assenting may be a question of fair dispute; but, if he furnished a legal ground of rescission by his breach of the contract, his assent to it was not necessary.

*5. SALES: rescission of contracts.*

IV. The foregoing discussion will suffice to disclose our view of the general merits of the case. The evidence is somewhat voluminous, and it would extend this opinion too much to discuss it in greater detail. Specific performance is at most a matter of large and just discretion of the court. It is not a matter

*6. SPECIFIC PERFORMANCE.*

of strict right to a plaintiff. *Smith v. Shepherd,* 36 Iowa, 253; *Thurston v. Arnold,* 43 Iowa, 43. It is an extraordinary remedy, and will never be awarded, unless the court can give the approval of its conscience to the contract presented. It is refused whenever the contract appears to the court to be unconscionable or inequitable. Generally speaking, any trace of unfairness or fraud will render specific performance unavailable to the plaintiff. *Throckmorton v. Davidson,* 68 Iowa, 644; *McDowell v. Caldwell,* 116 Iowa, 475; *Schneider v. Schneider,* 125 Iowa, 1.

For the reasons pointed out in the foregoing discussion, we are satisfied that specific performance ought not to have been decreed in this case. The decree of the court below will therefore be reversed, and the petition must be dismissed.—*Reversed.*