## Union Oil & Gas Company v. Cross, et al.

(Decided December 17, 1926.)

(Rehearing Denied June 24, 1927.)

### Appeal from Johnson Circuit Court.

1. Mines and Minerals.—Where owners of oil lands, after conveying undivided one-half interest in royalties to which they were entitled, gave second lease to a different lessee, but made no objection to first lessee's drilling, held, second lessee, who failed to assert his rights until after successful drilling by first lessee had no rights superior to first lessee, or his scccessors in interest.

2. Equity.—If circumstances are such as to show an intention on the part of a claimant to reserve a right of election to affirm or repudiate a contract according to the event thereof, and the delay is attributable to nothing other than a desire to await the event, and repudiate it if it turns out to be a bad contract, and to claim benefit if it turns out to be good, equity will not lend claimant any aid.

3. Equity.—Generally parties will be required to assert their rights within a shorter time, where the subject-matter of their contracts is subject to sudden and rapid increases or decreases in value.

E. L. McDONALD, D. L. HAZELRIGG and HOLT, DUNCAN & HOLT for appellant.

O'REAR, FOWLER & WALLACE and WHEELER & WHEELER for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

On May 19, 1916, M. H. Evans and his wife, Martha Evans, as party of the first part, in consideration of $1, executed a lease to A. C. Albin, party of the second part, whereby they granted and leased unto Albin all the oil

and gas in and under a certain tract of land, containing 65 acres, together with the right to enter thereon at all times for the purpose of drilling and operating for oil or gas and to erect and maintain buildings and structures. and lay pipe lines necessary for production and transportation of oil and gas; the first party to have one-eighth of all oil produced from the premises to be delivered in pipe line with which the second party connected his wells; and if gas was found in sufficient quantities to transport, the second party was to pay first party $100.00 annually for each well for gas so transported, and the first party was to have gas at well free of cost to heat and light one dwelling. Albin was to have and to hold the above premises for 10 years, or as long as gas and oil was found in paying quantities, on these conditions: In case no well was commenced within 12 months then the grant should be null and void, unless the second party should thereafter pay at the rate of 10 cents an acre for each year drilling was delayed, and a deposit to the credit of first party in any bank doing business in Blain, Ky., should be good payment for any money falling due; and in case no paying well was drilled on the premises within 10 years the grant should be void.

On November 9, 1916, Evans and wife conveyed the land with general warrant to Sherman Lyon, their son-in-law, in consideration of love and affection and their maintenance during their natural lives.

M. H. Evans having died, on December 2, 1917, Sherman Lyon, his wife, Lora Lyon, and Martha J. Evans, the widow of M. H. Evans, conveyed to the Southwest Petroleum Company, in consideration of $65.00 in hand paid, a one-half undivided right to their interest in all royalties owned, had, or reserved in the Albin lease.

On February 9, 1920, Sherman Lyon served notice on the Union Gas & Oil Company, to whom in the meantime the Albin lease had been transferred, notifying it to begin operations at once by actually drilling in good faith and to prosecute the work continuously until the premises were developed, and that, if it failed to do so within a reasonable time, "suit will be brought against you for the cancellation of said lease." The notice also was to the effect that Lyon would not accept further rentals on the lease, and that the bank had been notified to this effect.

No suit was brought, but on May 16, 1921, Lyon and wife and Mrs. Evans executed a lease on the premises to James E. Cross in consideration of $1 cash in hand paid. In this paper there are blanks left as to the date before which a well is to be put down or as to the rent to be paid if a well was not put down. But at the same time there was a written contract signed by all the parties setting out the lease and providing that, as there was a prior lease on the premises, it was agreed that, if the parties of the first part should succeed in having the prior lease canceled, as they therein undertook to do, immediately upon its cancellation by a judgment of a court of final jurisdiction, Cross would pay them the sum of $3,000.00 and would begin a well on the premises within 30 days thereafter. No suit was brought after this contract was made and nothing was done by Cross, except that Cross put up notice on the land stating that he was the owner of a valid oil and gas lease thereon and all parties were notified not to move any drilling rig thereon or trespass in any manner upon his rights under his lease. These notices were nailed on the gate posts where the road entered the land and at another point on the land. In December, 1921, the Union Gas & Oil Company, having notice that the lease had been made to Cross and of the notices which Cross had put up, moved one of its rigs upon the premises. Lyon and his family did not object. Cross knew what was going on and held his peace. In February, 1922, oil was struck, and other wells were afterwards put down by the company. On June 12, 1922, Cross brought this suit against the Union Gas & Oil Company, Sherman Lyon, Mrs. Lyon, Mrs. Evans, the Southwestern Petroleum Company, and the Cliff Petroleum Company, who held under the Southwestern Petroleum Company, praying that his title to the gas and oil under his lease be quieted and that the lease held by the Union Gas & Oil Company be adjudged void. On final hearing the circuit court adjudged him the relief sought. The Union Oil & Gas Company appeals.

It is clear from the evidence that netiher Lyon nor his wife, nor Mrs. Evans, have any right to insist upon a forfeiture of the Evans lease. They delivered to the appellant a writing stating that they did not consider the attempted lease to Cross as binding upon them and considered it a nullity. They also signed a division order for

the oil and actively encouraged the company to go on with its operations. But this was after the Cross lease was executed and Cross insists that his rights are not affected by their conduct. He himself, however, although knowing that the company had entered and was boring for oil, failed to assert his rights or to make any objection until oil was struck, evidently waiting to see what the event would prove.

The clause of the lease defining what Cross was to do is in these words:

"If no well be commenced on said land on or before the ———day of———, 191—, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to———,who is hereby appointed agent for such purpose, in the manner hereinafter provided, the sum of——— dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well, for——— months from said date."

The reason that these blanks were left in the lease is shown by the written contract executed at the same time between the parties, which, after setting out the lease, is as follows:

"Now, therefore, it is agreed by and between the parties of the first part (the lessors), and the party of the second part (the lessee), that if first parties shall succeed in having the lease now asserted on same cancelled and held for naught, which lease is claimed by the Union Gas & Oil Company, and which first parties by suit to be instituted in the federal court will seek to have cancelled and adjudged void: Now, immediately on the cancellation of said lease by a judgment of a court of final judisdiction, or a surrender of said lease by the lessee, or any assignee of same. that is, that said judgment cancelling said lease or adjudging it void by a court of final jurisdiction, the said party of the second part will pay to the parties of the first part the sum of $3,000, and in addition thereto has paid the sum of $1 in cash as an additional consideration for this lease this day executed. In addition thereto the party of the second part binds and obligates himself that, within 30 days from the cancellation of said lease by a court

of final jurisdiction, the surrender of said lease or the affirmance by the court of final judicdiction of the cancellation or the surrender of said lease, to begin a well within 30 days from such surrender or cancellation by a court of final jurisdiction.''

By the terms of this writing, read in connection with the lease, and the blanks therein, Cross was under no obligation to the lessors until they sued and obtained a cancellation of the prior lease, or it was surrendered. They brought no suit, as they agreed to do. Cross, knowing this, brought no suit. When they failed to sue, the courts were open to him to protect his rights. They not only failed to sue, but later actively joined the lessee under the prior lease to secure the development of the property, telling it that the Cross lease was of no validity. Cross had failed for months to bring any action before the prior lessee entered. It was incumbent on him then, at least, when he knew that his lessors had not sued and were standing by the prior lease in its entry, to act unequivocally and assert his rights under his contract. If he conceived that he had rights in the property under his contract, when his lessors failed to sue, as they had agreed to do, it was incumbent on him then, at least, to assert them. He knew that the prior lessee had entered under its lease, claiming it was valid, and that his lessors were cooperating with it. Under such circumstances he could not remain silent, and take the chances of losing nothing if no oil was found, but claim the property if oil was found. The lease to him was not an absolute lease. It was conditional, and to take effect when the prior lease was out of the way.

It is clear, from the two papers read together, that it was not contemplated that a present right against Cross as lessee should vest in the lessors. This court has held that a second absolute lease operates as an election to terminate a prior lease. But that is not this case. Here the lessors agreed to sue and obtain the removal of the prior lease, and until they did this Cross was under no obligation to them. When they failed to sue, the condition on which the lease to him became absolute did not happen. The lease could then only become operative by his bringing the suit they had failed to bring. He was required to elect which course he would pursue. He could not stand by and wait to see if oil was struck, and then assert rights

which he elected not to assert when he did not know whether or not there was oil in the land. The prior lease remained in force, unless he then took the course necessary to make his lease absolute and obligatory on him. This he did not do. It was not sufficient for him to put up notices on the property. To make his lease obligatory on him, he should have taken affirmative action to enforce his contract. It was a case where he was required to act promptly, and, failing in this, he cannot be heard in equity, after the discovery of oil in the land has changed entirely the aspect of things.

The case falls within the following wise rule:

"Again, if the circumstances are such as to show an intention on the part of the complainant to reserve to himself a right of election to affirm or repudiate a contract, according to the event thereof, and this delay is attributable to nothing other than a desire to await the event, and repudiate it if it turns out to be a bad contract, and claim the benefit of it if it turn out to be a good one, equity will not lend him any aid. In general, parties will be required to assert their rights within a shorter time, where the subject-matter of their contracts is subject to sudden and rapid increases or decreases in value, and greater temptations are thereby afforded for speculative litigation." 10 R. C. L. p. 401. "A marked appreciation or depreciation, according to circumstances, in the value of the property involved, where the right might have been asserted before such change, and the granting of relief would in consequence of the change work in equity, is ordinarily fatal to plaintiff's case." 21 C. J. p. 233.

Cross was drilling for oil on Big Point creek, five miles from the property. While he did not know the exact day appellant moved in; he did know it had entered under the prior lease. In his deposition he so states:

"Q. You knew when the Union Oil & Gas Company moved on and made its first location, I believe? A. I knew about, not exactly.
"Q. Did you learn that it was drilling before the first well was completed? A. Yes."

Judgment reversed, and cause remanded for a judgment dismissing the petition.