KEYERLEBER ET AL., APPELLEES, *v.* THE EUCLID CONGREGATION OF JEHOVAH'S WITNESSES, APPELLANT.

(No. 24075—Decided May 31, 1957.)

*Messrs. Morley, Stickle, Keeley & Murphy,* for appellees.
*Mr. Bennett Yanowitz,* for appellant.

KOVACHY, J.    This is an appeal on questions of law and fact from a decree of the Common Pleas Court of Cuyahoga County.

Plaintiffs, Paul G. Keyerleber and Anna E. Keyerleber, are husband and wife and were joint owners of a parcel of land

fronting 200 feet on Old Chardon Road in the village of Richmond Heights. They live in a single family house situated on the easterly 60 feet of the parcel.

The defendant, The Euclid Congregation of Jehovah's Witnesses, is a religious organization duly chartered as an Ohio corporation not for profit. In 1955, this church group had an unfortunate experience in negotiating for a parcel of land upon which to build a church edifice called by them a Kingdom Hall. The owner of the land had committed himself to sell, and when the congregation sought a permit to build its Kingdom Hall, the neighbors, openly professing prejudice against it, brought such pressure to bear upon the owner and the officials of the city in which the land was located as to cause the owner to repudiate the contract and sell the land to another.

To avoid a recurrence of that experience, The Euclid Congregation of Jehovah's Witnesses decided to buy land in the name of the president and servant of the corporation, Robert J. Wendt, and have him transfer the property to it. To carry out this plan, the defendant sought out as real estate brokers The Powers Realty Company. It explained its problem to the members of this firm and proposed that some property suitable to them be bought in the name of Robert J. Wendt and that the seller not be informed of who the real purchaser was or the purpose of the purchase until the consummation of the sale. They felt that such procedure would also save the prospective seller embarrassment and forestall pressure upon him by his neighbors. A salesman by the name of Mr. Adams was assigned by The Powers Realty Company to carry out this scheme. Mr. Adams phoned the Keyerlebers and suggested that they sell vacant land immediately adjacent to their residence. The Keyerlebers made inquiry as to the prospective purchaser, and Mr. Adams, in answer, said: "A young man who wanted to buy property for his personal use." Upon this information, the Keyerlebers agreed to sell 140 front feet of their land. Mr. Adams visited them shortly thereafter with a written offer signed by Robert J. Wendt, which offer they accepted and signed. When Mrs. Keyerleber requested that they meet the buyer, Adams parried by saying: "I assure you he is a splendid young man" and "It's not our policy to demand

that the buyer and seller meet." When she then asked as to when this young man would build his home, Adams answered: "Oh, not for a while. He is a single man. The residence will not be built immediately." The writing that was executed had the printed expression "except restrictions of record" crossed out. Both Mr. and Mrs. Keyerleber signed the instrument. It was dated March 15, 1956. Subsequently, on May 10, 1956, a warranty deed transferring plaintiffs' property to Robert J. Wendt was filed for record. Plaintiffs first met Robert J. Wendt on May 18, 1956, when he personally brought the check representing the purchase price to their home. It appears the check had been inadvertently sent to him by the escrow agent. On that occasion he met Mr. Keyerleber alone and informed him that the real purchaser of his land was The Euclid Congregation of Jehovah's Witnesses and that he, as its agent, planned to transfer the property to it. He likewise acquainted Mr. Keyerleber with defendant's plan to build a Kingdom Hall. Mr. Wendt returned that same day with the architectural drawings and showed them to Mrs. Keyerleber who by that time had been informed by her husband that The Euclid Congregation of Jehovah's Witnesses was the true purchaser of this land and the purpose for which it was acquired. During these visits, plaintiffs made no objection to the type of structure proposed nor to the misrepresentations that had been made in the transaction. In fact, Mr. Keyerleber suggested that the congregation buy their home, and, when told that the church had no paid minister, discussed the possibility of Mr. Wendt buying the house for his parents, and Wendt was shown through the house with that in view. Mrs. Keyerleber told Wendt that they would not have sold the lot had they known the true purchaser and its purpose to erect a church, but neither Mr. nor Mrs. Keyerleber displayed anxiety over the plans of the defendant to build a Kingdom Hall next to their home, since the property was zoned for single family residence and they felt certain that the village council would not issue a permit to build a church edifice on the site. Wendt replied, when informed of the zoning regulation, "that they would take their chances." No suggestion at either meeting, however, was made that the lot be returned because of the fraud practiced. The check was ac-

cepted and immediately cashed. The Keyerlebers did phone members of the village council and zoning board and were reassured by them that the village council would not issue a permit to the defendant for the construction of a church, since they would respect the zoning of the land for single family dwellings. By this information, the Keyerlebers were convinced that the defendant would be unable to carry out its plan to build a Kingdom Hall on the land it purchased and so did nothing about the situation. As a matter of fact, they subsequently offered to sell additional land for parking space to the defendant, if needed, and assisted in determining the boundary line of its land. On this occasion Mr. Wendt heard Mrs. Keyerleber object to the building of a church because "it was going to hurt the value of their home," to which Mr. Keyerleber replied: "It is over and done. Don't talk about it." The defendant went ahead with its plans. Robert J. Wendt conveyed the land to it by deed (this deed was filed for record July 6, 1956). On May 21, 1956, defendant's attorney presented to the village council plans for the building of a Kingdom Hall on the lot acquired. The plans were referred to the zoning and planning commission for study and report. On June 18, 1956, the zoning and planning commission recommended to the village council that the property not be rezoned for the building of the Kingdom Hall "because residents were against rezoning and the property was not sold for a meeting hall." On July 2, 1956, the village council rejected the request of The Euclid Congregation of Jehovah's Witnesses to rezone the property to permit the building of a Kingdom Hall (the Keyerlebers learned of this from an article in the Hillcrest Sun Press on July 5, 1956). On August 6, 1956, the defendant instituted a mandamus action in the Court of Appeals of the Eighth Appellate District against the village of Richmond Heights and its officers, praying that the village and its officers be compelled to issue a permit to build its Kingdom Hall. On August 23, 1956, the village council discussed construction changes with the attorney of the defendant and instructed the village solicitor to negotiate a settlement of the lawsuit.

On September 17, 1956, after the defendant had agreed to certain changes requested of it in the construction of its King-

dom Hall, the village council instructed its building commissioner to issue a building permit. On September 22, 1956, the defendant instituted an action in the Common Pleas Court for authority to place a mortgage on its property, and this request was granted. Thereafter, a mortgage commitment was obtained from the Watchtower Bible and Training Society. The defendant then let contracts for excavations and masonry work, and men were hired to put in the footings. By the time the action in the instant case was filed and a restraining order issued by the Common Pleas Court, the land of the defendant had been leveled and excavations completed for the footings preparatory to pouring the concrete. Thus, the defendant had proceeded with its activities in the firm belief that the plaintiffs had fully acquiesced in it being the owner of the property. The building they propose to erect is a one-story basementless ranch-type, pitched roof, building of modern design. It is not objectionable from an architectural standpoint.

Plaintiffs first learned of the issuance of the building permit on September 18, 1956, and, thereupon, employed counsel to send a letter to Robert J. Wendt and The Euclid Congregation of Jehovah's Witnesses requesting that the sale and transfer of the property be voided and the land reconveyed to the plaintiffs, in which event they promised to refund the purchase money. This letter was dated October 2, 1956. The request was immediately rejected by both Mr. Wendt and the defendant. Plaintiffs, thereupon, filed their petition in the Common Pleas Court of Cuyahoga County claiming that the plaintiffs would not have sold their land to defendant's agent, Robert J. Wendt, had they known the purpose for which it was being purchased; that the defendant, acting through and in collusion with its agent, Robert J. Wendt, defrauded plaintiffs, to their great damage; that they sold their property at a price in keeping with the intended use for which the property was zoned; and that, had they been willing and desirous of bringing upon themselves an immediate neighboring structure other than a residence dwelling, they could have demanded and received a price greatly in excess of that which they did receive. They further aver that they had offered to return to the defendant the purchase price of the property, which tender the defendant re-

fused, and that they are ready, willing and able to pay to the defendant or to pay into court such sum as may be ordered by this court as a condition of granting the relief prayed for. They then pray for cancellation of the deeds of conveyance from plaintiffs to Wendt and from Wendt to defendant, reconveyance of the property to them, and an injunction restraining the defendant or any of its agents from constructing a meeting hall on the property. In the answer the defendant admits the agency of Robert J. Wendt and the conveyance to it of the property from Wendt, and enters a general denial thereafter. As a second defense they set forth that the property was transferred to Wendt on May 10, 1956; that the plaintiffs learned of the agency of Robert J. Wendt and of the purpose for which the land was purchased by it on May 18, 1956, but took no action whatsoever to rescind the contract, although they had knowledge of the defendant's efforts to obtain a building permit and were aware of the plans for the construction of the church on the property; that the plaintiffs retained the consideration paid to them; and that, during the months of May, June, July, August and September of 1956, it proceeded with its plans and went to much trouble toward the consummation of them. It further claims that by reason of this long delay in bringing their action the plaintiffs are barred of the right to rescind the contract and pray for dismissal of plaintiffs' petition. The plaintiffs in their reply admit the transfer of title to Robert J. Wendt on May 10 and that they were informed for the first time on May 18, 1956, of the existence of the agency relationship between the defendant and Robert J. Wendt and of the true purpose for which the land was purchased. They admit that they took no similar action to rescind the contract until October 2, 1956; that they were satisfied upon agreeing to sell their property to have the parcel used for the purposes for which it was zoned; that upon becoming informed of the true facts they communicated with officials and representatives of the village of Richmond Heights and were assured that the defendant would not be granted a building permit for the construction of a structure other than a single family dwelling; that within two weeks after the issuance of a building permit on September 17, 1956, they seasonably offered to repurchase

the property from the defendant; that Robert J. Wendt and the defendant refused the offer; and that as a result of such refusal they brought this action for equitable relief to rescind the contract and obtain the reconveyance of the realty conditioned upon the repayment to the defendant. They further say that they informed Robert J. Wendt on May 18 that the land was zoned for single family dwelling use only and claim that the defendant did not act in good faith in proceeding to make expenditures after learning the sole purpose for which the realty was zoned and sold; that they took no further steps because they recognized that defendant's intended fraud had not materialized; and that they were satisfied on the assurances from the village representatives that the realty could not be used for the purpose intended by the defendant. They say further that they received no notice during the months of May, June, July, August and September, written or oral, from the village officials reversing their original position not to issue a building permit; that they took immediate steps to investigate and determine their rights in equity, to prevent the defendant from defrauding the plaintiffs by constructing on this parcel a structure other than a single family dwelling, upon learning of the issuance of the building permit; and that they, therefore, reiterate their prayer as set forth in their petition for the cancellation of the deed of conveyance from the plaintiffs to Robert J. Wendt and for cancellation of the deed of conveyance from Robert J. Wendt to the defendant and for a restraining order to prevent the construction until such time as the reconveyance may be made to them.

The essential facts of this case are clear and beyond dispute. The defendant, because of a previous difficulty in attempting to buy land to build a Kingdom Hall, decided to buy vacant land in the name of its president and servant, Robert J. Wendt, without disclosing its interest in the property and its purpose to build a church edifice. Such a plan, it believed, would prevent pressure from being brought by neighbors on the seller of the land and thus spare him the embarrassment that they felt would follow any attempt to sell land to it. The defendant did not look upon such plan as dishonest. Rather, it felt it was a practical approach to a difficult situation and

one which was necessary for it to pursue to obtain land for its Kingdom Hall. It then found a real estate firm to agree to go along with the scheme, and as a result a compact was entered into to that effect between the defendant, its agent, Robert J. Wendt, and The Power Realty Company. Mr. Adams, the salesman for The Power Realty Company, became the instrumentality for carrying out this cabal, and he performed capably in the furtherance of the scheme. These basic facts show beyond question that a fraud had been perpetrated upon the Keyerlebers, and that The Euclid Congregation of Jehovah's Witnesses was the instigator of it. The motive that prompted the defendant to engage in the scheme in no way minimizes the deceit practiced and the legal consequences flowing therefrom, and the defendant is accountable under the law for it. The plaintiffs, as owners of the land, were deprived of a valuable right by the fraud perpetrated upon them, namely, the right to dispose of their property to whomever they wish. This right—*jus disponendi*—is an incident of the ownership of property. It is of particular value to a person selling land immediately adjacent to his own residence, since his personal relationship with a neighbor is involved. Moreover, the value of his property is directly affected by the nature of any structure to be there erected. To equity, the violation of a legal right imports damage whether there is a monetary loss or not. A court of equity, "if it finds that a clear right has been invaded, and that redress can be secured by putting the parties back in their original position, * * * will seldom refuse its aid because the plaintiff can show no substantial damage to his pecuniary interests." *Brett v. Cooney*, 75 Conn., 338, 342, 53 A., 729.

In *Morrow* v. *Ursini*, 96 Conn., 219, 113 A., 388, a case quite similar factually, heard before the Supreme Court of Errors of Connecticut, the syllabus reads:

"An owner of land had refused to sell it to a prospective purchaser, or to any one representing him, because such purchaser wished to obtain the land in order to resell it for cemetery purposes. Thereafter the owner was induced by another person to enter into an agreement of sale of the land to the latter's minor son upon his (the father's) fraudulent representations that it was desired for his and the son's use and that they

were to occupy it. In fact these vendees had entered into a conspiracy with the first offeror to secure the land for him, and he supplied the money with which to pay a deposit on it, and shortly after the execution of the agreement the vendees quitclaimed their interest thereunder to his wife. *Held* that the owner might have the agreement of sale set aside for fraud, and removed from the land records as a cloud on his title, without showing substantial damage to his pecuniary interests.''

In *Thompson* v. *Barry*, 184 Mass., 429, 68 N. E., 674, heard before the Supreme Judicial Court of Massachusetts, it was held that fraudulent representations of a purchaser's agent that the purchaser was a man of means, with a small family, who wanted a lot, which was next to the vendor's residence, for a home, whereas the purchaser was a Catholic corporation which wanted it for a church site, are grounds for rescission; and that the vendor's right to rescission of the deed for fraudulent representations of the purchaser's agent as to who was the purchaser is not affected by his having paid part of the agent's commissions.

55 American Jurisprudence, 572, Section 96, states the proposition of law involved as follows:

''The vendor, however, has the right to select the person to whom he will sell and may rescind if, intending to sell to one person, he is deceived as to the purchaser's identity and thus induced to enter into a contract with one to whom he did not intend to sell.''

27 Ruling Case Law, 391, Section 95, reads in part as follows:

''On the other hand it has been held in a number of cases that where a purchaser induces the vendor to sell by falsely representing the use for which he desires the land, and knows that the sale would not be made if the vendor knew the use for which the land is wanted and to which it is attempted to be put, and that such use will greatly injure the value of other land of the vendor in the vicinity, this constitutes a fraud entitling the vendor to rescind.''

See, also, 121 A. L. R., 1174; *White Tower Management Corporation* v. *Taglino*, 302 Mass., 453, 19 N. E. (2d), 700; *Walker* v. *Galt*, 171 F. (2d), 613, 6 A. L. R. (2d), 808; *Robinson* v. *Richards*, 209 Mass., 295, 95 N. E., 790.

In the case of *New York Brokerage Co.* v. *Wharton,* 143 Iowa, 61, 66, 119 N. W., 969, the court said:

"It is the right of a party to a contract to know with whom he deals unless he consents to deal with an agent in behalf of an undisclosed principal. He has a right to rely upon representations made as to the identity of the other party to the contract, and, if deceived by such representations, he has the right to rescind."

To the same tenor: *Coan* v. *Consolidated Gas Electric Light & Power Co.,* 126 Md., 506, 95 A., 151; *Gloede* v. *Socha,* 199 Wis., 503, 226 N. W., 950.

It would appear, therefore, that the Keyerlebers had the clear right to void this transaction upon discovering the true facts on May 18, 1956, even though at that time they could not have shown a pecuniary damage resulting from the sale of their land, since it then seemed certain that the defendant would not be given a permit by the village council to build its Kingdom Hall. The fact is, however, that they did not bring their action for rescission until October 2, 1956, some three and one-half months after they were aware that the right to do so existed, and then only because the village council had reversed its position and ordered a permit to be issued to the defendant to build its Kingdom Hall. By that time, however, the defendant had presented the plans for its building to the village council; instituted a mandamus action in the Court of Appeals of the Eighth Appellate District; continued discussions with the representatives of the village; made certain changes in the construction of its Kingdom Hall, at the suggestion of the council; obtained permission from the Common Pleas Court to mortgage its property; secured a mortgage commitment; let a contract for all excavation and masonry work; had the land leveled; had excavations completed for the footings; and made all preparations for pouring the concrete.

The crucial questions in this case thus become:

1. Was the action for rescission seasonably brought after the discovery of the fraud?

2. Did the Keyerlebers, by their conduct, upon learning the true facts, lead the defendant to believe, to its injury, that they had acquiesced in the contract?

3. Should a court of equity lend its aid to persons who, although having a right to rescind a contract, wait to see if the transaction turns out to their benefit and seek their remedy of rescission only after the happening of an event which is unfavorable?

The rule is well settled in courts of equity that a person seeking rescission of a contract on the ground of fraud must exercise the right promptly upon the discovery of the fraud and that any delay or act inconsistent with the degree of promptness required by the circumstances is a bar to relief and constitutes a defense to the proceeding. 24 American Jurisprudence, 32, Section 208.

The plaintiffs here accepted and cashed the check representing the purchase price to their land after full disclosure of the true facts had been made. They discussed selling their home to the defendant. They also suggested that the defendant buy additional land for parking purposes. They knew that the defendant was taking steps to obtain a building permit. They saw representatives of the defendant plotting and leveling the land, digging the footings and proceeding in every way to carry out its object. Yet they did nothing for three and one-half months to indicate to the defendant that they were not accepting the situation that had been foisted upon them through fraud and that they would demand the return of the property by reason of the deceit. It seems to us, therefore, that under the circumstances here set forth they acquiesced in the sale of the land and in legal effect affirmed the contract made and waived the right to ask for its rescission in a court of equity. It is stated in 55 American Jurisprudence, 1016, Section 624:

"Fraud on the part of the purchaser which induces a vendor to enter into a contract for the sale of land ordinarily will give the vendor the right to rescind the contract, but as in any other case involving rescission of the contract or transaction on the ground of fraud the vendor must act promptly on the discovery of the fraud; if after discovering the purchaser's fraud, the vendor takes any benefit under the contract, as by receiving payments on the purchase money, or does any other act which implies an intention to abide by the contract, he loses his right to rescind."

The Supreme Court of Virginia, in *Rector and Visitors of University of Virginia* v. *Asa Snyder & Co.,* 100 Va., 567, 42 S. E., 337, states the following in the syllabus:

"5. In order to void a contract for fraud, the fraud must be plainly averred and clearly proved. When established, it renders the contract voidable at the option of the party injured, but his right to disaffirm must be exercised promptly, without unnecessary delay, the time depending upon the circumstances of the particular case.

"6. The election to abide by a contract which a party might have avoided may be shown by proof of acquiescence in it, and any act which discloses an intention to abide by the contract will be sufficient to ratify it, provided the acquiescence or ratification was with knowledge of the facts which gave the right to repudiate it. Such election, when manifested by mere acquiescence or positive acts, when once made, is, as a rule, irrevocable."

See *Faulkner* v. *Wassmer,* 77 N. J. Eq., 537, 77 A., 341.

It is, also, stated in *Brown* v. *Young,* 62 Ind. App., 364, 110 N. E., 562, that:

"3. The length of time a party to a contract permits to elapse does not necessarily determine the right to rescind, the governing consideration being whether the delay has been long enough, under the circumstances of the particular case, to result in prejudice to the other party."

See, also, 6 Ruling Case Law, 932, Section 315; *Henry Christian Bldg. & Loan Assn.* v. *Walton,* 181 Pa., 201, 37 A., 261; *Fitzwater* v. *Norcross,* 95 Colo., 527, 37 P. (2d), 522.

Moreover, the defendant, assuming from the action of the plaintiffs that the contract was binding, which it was justified in doing under the circumstances, incurred expenses and acquired valuable privileges which would be valueless to them if the contract were voided. Courts of equity are reluctant to rescind a contract which will cause injury to a party through the failure of the party seeking relief to exercise its right seasonably. For that reason, this contract cannot now be rescinded. In *Fitzwater* v. *Norcross, supra,* the Supreme Court of Colorado said in paragraph six of the syllabus:

"One who, with knowledge, induces another to believe that

he acquiesces in a transaction, and by reason of that belief the latter alters his position to his injury, may not repudiate the transaction to the other's prejudice."

There is a further consideration that in our view of the matter estops the plaintiffs from obtaining a rescission of this contract. They knew the true facts in May and should have acted promptly at that time, knowing that the defendant would apply for a change of the zoning ordinance in order to obtain a permit to build its Kingdom Hall. At that time, however, they felt secure because the village officials had assured them that no permit to build a church building would be issued. In other words, they were perfectly willing to keep the money paid them for their property and accept The Euclid Congregation of Jehovah's Witnesses as the purchaser of their property so long as the defendant was unable to build its Kingdom Hall. But when the permit to build was issued, they came into court to rescind the contract. They took their gamble and lost and now seek the aid of a court of equity to perform like an ace in a game of skill to rescue them from the unsuccessful result of *their* game of chance. Equity cannot lend its aid under such circumstances. In *Union Oil & Gas Co.* v. *Cross,* 220 Ky., 271, 295 S. W., 172, the Supreme Court of Kentucky announced the equitable doctrine involved, in paragraph two of the syllabus:

"If circumstances are such as to show an intention on the part of a claimant to reserve a right of election to affirm or repudiate a contract according to the event thereof, and the delay is attributable to nothing other than a desire to await the event, and repudiate it if it turns out to be a bad contract, and to claim benefit if it turns out to be good, equity will not lend claimant any aid."

Accordingly, this court unanimously holds that while the plaintiffs had just cause for the rescission of the contract of sale entered into with the defendant, they waived their right of rescission by their conduct subsequent to the disclosure of the fraud perpetrated upon them, and, in addition thereto, this court holds that the plaintiffs are also estopped from obtaining a rescission of the contract since a court of equity will not come to their aid when the action for rescission was brought

436

only after the happening of an event that made the contract unattractive and displeasing to them.

*Decree for defendants.*

SKEEL, P. J., and HURD, J., concur.