LEBEIS *v.* RUTZEN.

1. CONSPIRACY—FRAUD—SALE OF STOCK—FINANCIAL CONDITION OF CORPORATION—EVIDENCE.

In action for conspiracy to defraud in the sale of stock because defendants allegedly rendered a false statement in regard to the financial condition of corporation manufacturing hosiery and in which all parties were then directors and plaintiff also its treasurer, evidence *held,* insufficient to show either the falsity of the statement or that plaintiff relied on it to his detriment.

2. SAME—FRAUD—EVIDENCE—SALE OF STOCK—OPINIONATIVE STATEMENT—BAD FAITH.

Opinionative statement by defendant, president of corporation whose stock was largely held by plaintiff, his brother, defendants, and relatives of both parties, that company would not be able to pay salaries to directors for the month preceding and that it was problematical when salaries could be resumed *held,* in seller's action for conspiracy to defraud, not to have been made in bad faith where made during negotiations which resulted in sale of stock by plaintiff and his brother to defendants at a time when prudent business policy demanded conservation of cash resources and corporation was under no contract to pay salaries to the directors.

3. SAME—SALARIES OF DIRECTORS—EVIDENCE—PAYMENT OF PURCHASE PRICE OF STOCK.

Question as to falsity of statements that corporation was unable to continue to pay salaries to directors made by defendants allegedly for purpose of inducing plaintiff and his brother to sell their stock at lower price than its value *held,* not for jury in action for conspiracy to defraud under evidence showing that half of purchase price was paid by money corporation borrowed from defendant directors who controlled the common stock, and retirement of stock and the two directors materially improved

---

* Continued from Vol. 288.

surplus condition on paper and partial payment on purchase price of stock was made by corporation within two months after purchase.

4. FRAUD—DIRECTORS' CONCEALMENT OF AFFILIATION WITH ANOTHER CORPORATION.

Concealment by defendant directors of their pecuniary interest in another corporation also engaged in manufacturing hosiery at time they induced plaintiff and his brother, fellow directors but in charge of phases of the business conducted away from the factory and main office, to dispose of their holdings *held,* not shown to have been of any substantial inducement to plaintiff to sell his stock especially where other company had taken over portion of business plaintiff had been active in procuring abandonment of by company in which he had been interested.

5. CONTRACTS—FALSE REPRESENTATIONS MUST BE MATERIAL TO INVALIDATE TRANSACTION OTHERWISE VALID.

False representations, no matter how they are acted upon, are insufficient to invalidate an otherwise valid agreement unless they are material.

6. FRAUD—BASIS OF RECOVERY.

To permit recovery for fraud, the trier of the facts must be satisfied that the representations if made were untrue, and as applied to the transaction were material and such that a person of ordinary intelligence and possessing ordinary business qualifications would be likely to rely thereon and be misled thereby.

7. CONSPIRACY—SALE OF ASSETS AT INADEQUATE PRICE—EVIDENCE.

Fact that hosiery manufacturing company may have disposed of some of its machinery at an inadequate price to another company which took over the manufacture of a certain line of hosiery first company had abandoned *held,* no basis for claim of concealment in action for conspiracy by one director against fellow directors for fraud they are alleged to have practiced upon him incident to sale of his stock, where he knew price at which machinery had been sold.

8. SAME—EVIDENCE OF DAMAGE—CONCEALMENT OF DIRECTORS' AFFILIATION WITH OTHER CORPORATIONS.

Plaintiff stockholder and director who sought damages in action for conspiracy for fraud alleged to have been practiced upon him by fellow directors in the sale of his stock in a hosiery manufacturing company *held,* not to have shown that his ignorance of defendants' secret affiliation with another company

whose product was sold by corporation in which all parties were interested at barely any profit brought him injury.

9. SAME—SALE OF STOCK—UNLAWFUL CONTRACT OF CORPORATION—EVIDENCE.

Fact that corporation manufacturing hosiery and controlled by defendants may have unlawfully entered into a contract relative to silk *held,* immaterial in action by plaintiff, a former fellow stockholder and director with defendants, for conspiracy for fraud alleged to have been practiced upon him by them in connection with contract entered into by him which severed his relation with the corporation as any right of action in connection with the silk contract would accrue to the corporation and plaintiff had knowledge of its existence prior to the sale of his stock.

10. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.

On appeal from directed verdict and judgment for defendant the testimony is considered most favorably to plaintiff.

11. FRAUD—SALE OF STOCK—SCINTILLA OF EVIDENCE.

Evidence in action for conspiracy for fraud alleged to have been practiced upon plaintiff by defendants incident to sale of stock he had owned to corporation of which defendants were in control and plaintiff theretofore a fellow director where, even though his claims be accepted at their face value, except where they contravene a positive rule of law, the strongest case he has made out is legally insufficient to constitute a cause of action, submission of case to jury not being justified by a mere scintilla of evidence.

Appeal from Bay; McCormick (James L.), J. Submitted April 12, 1939. (Docket No. 83, Calendar No. 40,479.) Decided June 5, 1939.

Action by Fred W. Lebeis against Fred Rutzen, Louis Rupff, and Oscar A. Lebeis for alleged fraudulent misrepresentation in the sale of stock. Directed verdict and judgment for defendants. Plaintiff appeals. Affirmed.

*Fred P. Geib* (*Clem H. Block,* of counsel), for plaintiff.

*Emil Anneke,* for defendants.

BUTZEL, C. J. Fred W. Lebeis, plaintiff, his brother, Walter Lebeis, and another brother, Oscar A. Lebeis, one of the defendants herein, were partners in the Lebeis Hosiery Company, a jobbing concern, located at Chippewa Falls, Wis. Previous to 1923, the firm became interested in the Home-maid Hosiery Mills at Bay City, whose product, manufactured by defendants Rupff and Rutzen, the Lebeis brothers had found readily salable. After some negotiations, the concerns were merged in a new corporation known as the Evenknit Hosiery Mills, with a capitalization of $75,000 preferred and $100,000 common stock. Each of the five men originally owned about one-fifth of the common stock. At the time of the transaction here in question, Walter Lebeis held 1,962 shares, plaintiff 1,852 shares, Oscar Lebeis about 1,852 shares, Rutzen 1,740 shares and Rupff 1,600 shares. Preferred stock was held mainly by relatives. Up until the time he sold his stock in 1932, plaintiff, Fred W. Lebeis, occupied the position of treasurer of Evenknit. His brother Walter was secretary, Oscar acted as president, Rutzen was vice-president and head of the dyeing department, and Rupff was general manager of the mill. Each of the five men acted as a director and drew a salary of $9,000 per year from 1923 until 1931.

The company undertook the manufacturing of silk hosiery in Bay City, and as the business grew, also opened a number of retail stores for the sale of its products. With the exception of the year 1928, the profits of the company were over $30,000 a year from 1922 to 1929, inclusive. In 1929, Evenknit had a surplus of $179,739. Contemporaneously with the depression, however, the business began to show very large losses. This was due not only to general business conditions, but to the shift in style from seamless hosiery, which the company had manufactured

in substantial amounts, to full-fashioned hosiery. A large part of the capital of the company was tied up in the machinery and stock required to manufacture and market seamless hosiery which had lost favor among its customers and was difficult to sell at a profit.

The condition of the business continued to become worse. The directors finally agreed to abandon the manufacture of seamless hose and to concentrate entirely on full-fashioned hosiery. At a meeting on October 29, 1931, plaintiff offered the resolution, which was seconded by his brother Walter, that the seamless mill stop the knitting and manufacture of seamless hosiery about January 1, 1932, and that defendant Rupff dispose of any or all of the seamless mill equipment at the best price obtainable. This, however, did not materially relieve the tension of the business. In January, 1932, Oscar wrote that the bank was threatening to cut the company's line of credit. In April of the same year he wrote that Rutzen, Rupff and he had decided that the company must abandon the Minnesota territory and that plaintiff should be put in charge of an Evenknit Hosiery Shop in Minneapolis. He outlined prospective reductions in the company's personnel and stated that ''we will cut everybody's salary from the directors' down 20 per cent. effective May 1st.'' The salaries of the directors had already been reduced from $9,000 per year to $7,200 in 1931, and to $300 per month at the annual meeting in 1932.

All during 1931 and 1932, Oscar, as president, residing in Bay City, continuously found fault with plaintiff who was ''on the road'' for the company in Minnesota. In letters written from time to time he complained that plaintiff was selling merchandise at prices that were too low and on terms that were disadvantageous, and that he was not covering his terri-

tory in an economical or effective manner. He urged him to "cooperate" during the period of stress and warned him not to make damaging concessions to customers. In one letter written in 1932, Oscar stated:

"In this depression when mills are selling at cost, below cost or any old price to raise a little money, there is no use following such mills as they are heading for bankruptcy."

Such criticisms, whether justified or not, were resented by plaintiff and upset the harmony among the directors. On April 17, 1932, plaintiff wrote the three defendants, who were all living in Bay City, that he believed that at last the business was on a profitable basis and that he would not sell his stock for double its book value if he could see any happiness and peace of mind ahead. "But false accusations and irritating humiliations come at such frequent intervals" that he proposed to sell his stock for $30,000, $15,000 of which was to be payable in cash and $15,000 in Evenknit preferred stock. He also offered to sell the Evenknit line on a commission basis. He concluded with a request that if his associates would not accept his offer, they should at least give him some peace of mind so that he could travel with a fair degree of enthusiasm and efficiency.

On September 2, 1932, plaintiff and his brother Walter gave an option to the three defendants for the purchase of the combined stock of Fred and Walter, numbering 3,814 shares, for $10,000, half of which was to be paid in cash and the balance in monthly notes of $1,000 each. On this basis defendants subsequently purchased the stock. A year or two later general business conditions improved and the concern again became profitable. In 1938, almost six years later, plaintiff began this suit against de-

fendants, claiming that defendants conspired to defraud him in the sale of his stock. He claimed that they had misrepresented the condition of the company and had induced him to sell his stock at a wholly inadequate price. The case was heard before a jury and the trial court directed a verdict in defendants' favor. Plaintiff has appealed, claiming that there was sufficient evidence to submit the case to the jury on various theories of fraud which we shall discuss in order.

(a)   Plaintiff's first contention is that the losses of the company were misrepresented to him to induce him to believe that Evenknit was in worse financial condition than was actually the fact. He complains that there were discrepancies between the statements filed with the secretary of State and the annual statements furnished him. The annual report filed with the secretary of State for the year 1931 reveals a surplus of $96,294.70, while the report furnished plaintiff showed a loss of $52,111.50, which left a surplus of only $68,790.53. The discrepancy is readily explained by the inclusion of an allowance for depreciation in the statements furnished plaintiff, which item was not included in the filed statement, as expressly stated on its face. Plaintiff, however, claims that he was thus deceived because the directors had agreed not to include an allowance for depreciation in their statements and for this reason he was made to believe that the operating loss of the company was some $27,000 in excess of what had actually occurred. There was no formal record of such an agreement among the directors and there is no evidence that it was ever represented to plaintiff that the $52,111.50 loss was an operating loss. The report furnished plaintiff shows a depreciation reserve of $139,931.07 and the slightest comparison with the depreciation reserve set out in the report

for the year 1930, which plaintiff also had in his possession, would have indicated that depreciation for the year 1931 had been taken to the amount of $29,592.26. There is nothing in the record that suggests any bad faith on the part of defendants in issuing the report with a depreciation allowance included. Plaintiff himself admitted on the stand that he knew it was good bookkeeping practice to make a charge for depreciation to plant and machinery. Also, the statements were prepared by the bookkeeper and the record does not show that defendants, any more than plaintiff, were responsible for reports that may have been confusing but not deceiving.

In the report furnished plaintiff for the first six months of 1932, the surplus for 1931 had been put back to $96,714.88, which was approximately the figure submitted to the secretary of State. This was done to give the appearance of greater financial strength. No depreciation was taken for 1932 and, in fact, the allowance for depreciation of $139,931.07 for 1931 was reduced for the same reasons to $98,888.80. The difference, $41,047.27 was put back into surplus to cover up the operating losses. In the record which plaintiff had at his disposal, the loss was listed as $22,974.70. Without this manipulation of the depreciation allowance, the company's real loss without depreciation would have been shown to be $64,021.97. Rather than exhibiting the company's condition as worse than it was, this latter report to the secretary of State made the year's operations appear better than they actually were. The report of the first six months of 1932 was furnished plaintiff before he gave the option to sell. An examination of his own testimony reveals that either he relied on the statement which shows a smaller depreciation allowance than was proper, thus making his stock appear more valuable, or he was simply confused by

the statement and did not rely on it at all.  If he was confused, it was due to his failure to read the company's reports with care.  Where he failed to examine the accounts and statements of Evenknit although he himself was treasurer and director of the company, and where the same analysis that he made on cross-examination would have disclosed the entire situation to him, we cannot say that he has shown either the falsity of the statement or his reliance on it to his detriment.

(b)   In September, 1932, when plaintiff and his brother Walter came to the annual meeting, just prior to the sale of their stock, they were told by defendant Oscar Lebeis that there was no money available to pay salaries of the directors, that none of the directors would receive any salary for August, and that it was problematical when salaries to the directors could be resumed.  This opinionative statement, plaintiff argues, was a fraudulent inducement to him to dispose of his stock below its real value.  There is no evidence in the record of the financial condition of the company as of the date of this statement.  The balance sheet of June 30, 1932, however, indicates that the company had only $6,815.78 in cash on hand and $5,144.21 in accounts receivable, or a total of $11,959.99.  Against this, accounts payable totalled $11,358.53, pay roll payable $1,315.34, commissions payable $38.69, and accrued taxes $1,400.  Other current assets brought the total amount to $113,714.06.   The company, however, also owed $65,000 to the bank, $4,684 on machinery and $5,000 on notes payable to others including defendant Rutzen, thus making the total current liabilities amounting to $88,796.56.  Although total current assets exceeded total current liabilities, it is obvious that the financial condition of the company was such as to make the officers apprehensive.  Prudent business

policy demanded conservation of cash resources. It also might have been good business policy or even necessary for a concern owing a bank $65,000 to carry a fair sized bank balance. In the refusal to pay salaries to directors, who were under no contract to the corporation, defendants, as directors, can in no way be said to have acted in bad faith.

(c) Plaintiff urges, however, that the falsity of the statements is shown by the fact that though the corporation was purported to have been unable to pay salaries, it was able to pay out $2,500 as the first cash payment to plaintiff. The record does not support this claim. The corporation borrowed the $2,500 on notes from the three defendants who controlled its common stock. The company thus did not diminish its cash balance at the time. It did not begin to pay anything on the contract of purchase until the following month. Its surplus condition on paper was materially improved by retiring the stock purchased as it had a book value considerably in excess of the price paid. The record does not disclose when the notes to defendants were paid by the company. We are unable to say that payment of $1,000 in October, after two out of its five directors had retired from the management of the business, is evidence sufficiently material to go to the jury on the issue of whether it seemed advisable in September to continue to pay the salaries of five directors. The whole issue rests so largely on business judgment and opinion. It did not present any possibility of fraud. The record is barren of positive evidence that the directors' salaries could have been paid with safety. It rather indicates the contrary.

(d) What seems to be plaintiff's principal claim, however, is that he was fraudulently deceived into selling his stock by the secret machinations of defendants in helping to organize and purchasing i

terests in the Clearknit Hosiery Mills and Clearknit Hosiery & Lingerie Company, an affiliated firm, the former dominated by Reinhart Kriewall, at one time an employee of Evenknit. Pursuant to the resolution which plaintiff had introduced at the meeting of the Evenknit directors, its manufacture of seamless hosiery was abandoned and the seamless mill shut down. Kriewall bought some of the seamless machines and resolved to go into the manufacture of seamless hose. He had invested about $5,000 but needed financial assistance. Defendants each contributed $1,000 to the business. The Clearknit Hosiery & Lingerie Company had only opened one unit in Bay City at the time plaintiff sold his stock. Some of Clearknit's merchandise was sold to Evenknit and marketed by it from time to time, but plaintiff never learned that defendants were interested in the Clearknit groups until after he had sold the stock. Had he known of such ownership, plaintiff testified that he would not have sold the stock because he would "have demanded an explanation and accounting of the business."

There is some question whether Evenknit made a profit from goods purchased from Clearknit. Plaintiff claims that no profit was made. He states that he received reports showing this during the years 1931 and 1932 and "far back many years." As a matter of fact Clearknit was not organized until the early part of 1932 when Kriewall bought certain machines. There is testimony, however, that a slight profit was made. According to plaintiff, however, only $8,000 of merchandise was purchased by Evenknit from Clearknit during 1932 and prior to sale of plaintiff's stock. Even if the goods were sold at cost by Evenknit, the loss, if any, would be exceedingly small and could not have materially affected the business or the value of plaintiff's stock.

To entitle appellant to recover for fraud because of the representations by defendants that Clearknit was run by Kriewall, and concealment of their own interests in that company, it must be shown that this substantially induced plaintiff to sell his stock. False representations, we have often held, no matter how they are acted upon, are insufficient to invalidate an otherwise valid agreement unless they are material.

"In each case the court or jury must be satisfied that the representations if made were untrue, and as applied to the transaction, were material—of that character that a person of ordinary intelligence and possessing ordinary business qualifications would be likely to rely thereon and be misled thereby." *Hall* v. *Johnson,* 41 Mich. 286.

See, also, *Davis* v. *Davis,* 97 Mich. 419; *Starr* v. *Kleiser,* 224 Mich. 75.

While we by no means condone concealment of such facts by one director from a fellow director, there is no showing that plaintiff's sale of his stock was affected by his ignorance of the ownership of another company, which had taken over the seamless business that Evenknit had abandoned. It is clear plaintiff did not want Evenknit to re-enter that business; he testified that he "wanted nothing to do with the seamless business." He suggests that the knitting machinery was sold to Kriewall at an inadequate price. There is nothing in the record to sustain this, and, in any event, plaintiff had been informed of the price paid. There could not be any concealment on this ground, therefore.

Appellant argues also that defendants helped Clearknit market its products, and allowed Evenknit to buy seamless hose from Clearknit which it sold with barely any profit, losing overhead on the sales. This, however, plaintiff also was informed of; he was

furnished with accurate analyses of inventory and sales and the prices which were being charged for the merchandise. If the prices paid Clearknit for the $8,000 worth of merchandise so purchased were excessive, as plaintiff claims, and corporate assets were dissipated to buy unmarketable or unprofitable goods, or if competition from Clearknit was injuring the business, the injury was to the corporation and not to plaintiff who had knowledge of all relevant facts except the actual ownership of Clearknit. While plaintiff asserts with much emphasis that he should have been informed of the Clearknit enterprises, there is not a word of testimony to show that his ignorance brought him injury. He has failed to make out a case within the rule of *Buckley* v. *Buckley,* 230 Mich. 504.

(e) The same is true of a silk contract which plaintiff suggests was unlawfully entered into but from which it is not claimed defendants obtained any advantage. If defendants had improperly made this agreement, which is not disclosed by the record, the right of action was in the company. *Cyrowski* v. *Wojcik,* 280 Mich. 476. Plaintiff here is not suing as a stockholder in behalf of the corporation; he is suing for fraud and affirming the contract that severed his connection with the corporation. There is obviously no fraudulent concealment from him since he knew of the silk contract before he sold his stock.

We have carefully examined the entire testimony, considering the facts most favorable to plaintiff. *Taliaferro* v. *Railway Co.,* 249 Mich. 281. The record discloses that plaintiff was unhappy in his association with the Evenknit Hosiery Mills; that defendants lived in Bay City and held controlling interest in the company while plaintiff was an absentee minority stockholder who was given orders from the main office. He resented the criticisms of his work.

He was aware of the very bad business conditions, but insisted that his stock was very valuable. He reaffirmed that belief even when he offered to sell the stock because, as he stated, of the accusations and humiliations that were directed at him. We shall not further discuss the variety of reason that may have induced the sale; on account of the nature of the case, we have already prolonged its discussion. We find no evidence that the sale was induced by misrepresentation of a material fact on the part of defendants. Plaintiff either knew or could readily have discovered every fact that was known by defendants at the time of the sale which affected the price and value of his stock. Submission to a jury is not justified by a mere scintilla of evidence. *Conely v. McDonald,* 40 Mich. 150. Accepting plaintiff's claims at their face value, save where they contravene a positive rule of law, the strongest case he has made out is legally insufficient to constitute a cause of action. It thus became proper for the court to direct a verdict for defendants. See *Marcott v. Railroad Co.,* 47 Mich. 1, 7; *Grand Trunk R. Co. v. Nichol,* 18 Mich. 170; *Manos v. Railway Co.,* 168 Mich. 155 (L. R. A. 1917C, 689).

The judgment on the verdict is accordingly affirmed, with costs to defendants.

WIEST, BUSHNELL, SHARPE, POTTER, CHANDLER, NORTH, and MCALLISTER, JJ., concurred.