**Bertha ARBER and Ann Arber Broek, Plaintiffs-Appellants, Cross-Appellees,**

v.

**ESSEX WIRE CORPORATION and Walter F. Probst, Defendants-Appellees, Cross-Appellants.**

**Nos. 72–2121, 72–2122.**

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1973.

Decided Jan. 8, 1974.

---

See also D.C., 342 F.Supp. 1162.

Robert W. Jones, Cleveland, Ohio, for appellants-cross-appellees; Edward I. Stillman, Cleveland, Ohio, on brief.

Fred H. Bartlit, Jr., Chicago, Ill., for appellees-cross-appellants; H. Stephen Madsen, Frank T. Black, Cleveland, Ohio, Samuel A. Haubold, Charles E. Baxter, Chicago, Ill., on brief.

Before McCREE and KENT,* Circuit Judges, and CECIL, Senior Circuit Judge.

McCREE, Circuit Judge.

This is an appeal from a judgment for defendants in an action brought by appellants, Bertha Arber and Ann Arber Broek, her daughter, for rescission of a sale in 1961 of 525 shares of Essex Wire Corporation common stock to Essex.[1] The complaint, filed November 9, 1966, charged that Essex, the purchaser, and Walter F. Probst, the president of Essex at the time of sale and the principal negotiator on behalf of Essex, failed to disclose material facts relating to the stock's value in violation of state common law and of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[2] and the Securities and Exchange Commission's Rule 10b-5,[3] promulgated thereunder. The district court held that the evidence at trial did not establish any violation of state law or of the federal securities law and, alternatively, that appellants' claims for rescission were barred by laches. Appellants appeal from an order of July 26, 1972, denying

---

* Judge Kent died on May 28, 1973 and did not participate in this decision.

1. Bertha Arber died during the pendency of this action and Ann Arber Broek, as her executrix, continued the action on Bertha Arber's behalf.

2. 15 U.S.C. § 78j provides in pertinent part:
 *Manipulative and deceptive devices*
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 * * * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Rule 10b-5, 17 C.F.R. § 240.10b-5, provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

them a trial by jury and from the findings of fact and conclusions of law filed with the district court's decision on August 23, 1972. We affirm.

Herman Arber, a long-time employee of Essex and a plant manager for Essex until his death in 1948, the deceased husband of Bertha Arber and the father of Ann Arber Broek, originally purchased all 525 shares of stock that were transferred to Essex in the 1961 sale. In his will, Herman Arber bequeathed a life interest in 500 shares to Bertha Arber, with the remainder interest to Ann Arber (Broek), and 25 shares to Bertha Arber outright. In 1951, during a conversation with an attorney representing the Arbers in a transfer of their stock interests to a trust, Probst first inquired whether they might be interested in selling their stock to Essex for $100 per share. Subsequently, the attorney, on behalf of the Arbers, declined Essex' offer, and told Probst that Bertha Arber had a high regard for the management of Essex and believed the investment in the corporation was sound.

In 1959, Probst telephoned the Arbers and indicated that he had heard that they were interested in selling their Essex stock. The Arbers responded that they had not considered selling, but would discuss the matter with Probst. A meeting was held during which Probst informed the Arbers that Essex was doing well, showed them financial statements, and again, on behalf of Essex, offered to purchase their stock, this time for $250 per share. The Arbers responded that they wanted to consult family members and would contact Probst if any interest in selling developed. At some time after this, Ralph Arber, the brother of Ann Arber Broek and a competent businessman who had worked for Essex at one time and later started his own business in competition with Essex, strongly advised Bertha Arber not to sell the Essex stock.[4]

Nevertheless, in early 1961 Ann Arber Broek contacted Probst and inquired whether Essex remained interested in purchasing its stock held by the Arbers. After this, a meeting was held between Probst and Broek, at which time Probst commented that Essex was continuing to do well and that the Arbers were fortunate in waiting because the price then being offered by Essex had risen from $250 per share to $350 per share. Broek replied that she wished to discuss the matter with other members of the family. Shortly thereafter, Broek telephoned Probst and informed him that after family discussion they had decided to accept Essex' offer of $350 per share, or $187,350. Some time late in 1961 the transaction was completed.

In January 1965, Broek learned from a prospectus that Essex shares were being offered to the public at a price, after adjustment for a stock split, equivalent to more than $2,000 per share transferred in 1961. She testified, ". . . we didn't do anything at first. My husband and I thought there was nothing that could be done." After some months had gone by they talked to an attorney who was an old family friend and later commenced this action on November 9, 1966 with the filing of the complaint against Probst and Essex. During the period of approximately 22 months between the Broeks' reading of the prospectus and the institution of this action, the value of the Essex stock appreciated by about sixty percent. The stock continued its meteoric rise and at the time of the trial in the district court, the price at which Essex was traded, according to appellants, was four times the price at which it had gone public in 1965.

Initially, after an evidentiary hearing in September 1970, the district court dismissed the federal claim on the grounds that the sale did not involve the use of the mails or other instrumentalities of interstate commerce. During trial, however, appellants offered newly discovered evidence on the jurisdictional issue, and the court, taking appellants'

4. Ralph Arber also testified that Probst discussed the potential sale of the Arbers' stock with him in several conversations.

motion under advisement, permitted evidence to be presented on the federal as well as on the state law claim.

On this appeal the following issues are presented: (1) whether the evidence presented at trial established a violation of Section 10(b) in connection with the sale transaction; (2) whether the evidence presented at trial established that the conduct of the defendants constituted common law fraud; (3) whether appellants were denied their right to trial by jury guaranteed by the Seventh Amendment to the Constitution of the United States; and (4) whether the evidence supported the district court's conclusion that appellants' claims for rescission were barred by laches.

After a review of the entire record, we conclude that the findings of fact of the trial judge are not clearly erroneous, Fed.R.Civ.P. 52(a), and we set forth below the findings that are critical to the resolution of the issues presented on appeal.

We consider, first, appellants' claim under the federal securities law. The district court held that all allegedly undisclosed facts were either available to appellants or were not material. In addition, the court held that under federal as well as state law appellants must establish that if they had possessed the facts alleged to have been concealed, they would not have sold the stock; and the court found as a fact that appellants would not have relied on the facts they claim were undisclosed. On appeal, appellants urge that the court applied too restrictive a doctrine in determining materiality, and that proof of reliance is not required for a 10b–5 violation under federal law.

■ At the outset, we observe that underlying this provision of federal securities law is the Congressional judgment that full disclosure will help to ensure fair dealing in insider transactions. It is settled that Section 10(b) proscribes nondisclosure, as well as affirmative misrepresentation, of "material facts" affecting a stock's value. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968). This prohibition applies not only to an officer buying for his own account but also to a closely-held corporation, such as Essex in 1961, dealing in its own securities. Kohler v. Kohler Co., 208 F.Supp. 808, 820 (E.D.Wis.1962), aff'd, 319 F.2d 634, 638 (7th Cir. 1963); Northern Trust Co. v. Essaness Theatres Corp., 103 F.Supp. 954 (N.D.Ill. 1952).

■ The district court held that the requisite "materiality" could be demonstrated only by a showing of nondisclosure of "special facts" such as mergers or sale of assets, not ascertainable from the books, which "greatly appreciate" stock value. We think this test is overly restrictive of the Congressional purpose and contrary to the general interpretation of Section 10(b) in the federal courts. Whether undisclosed facts are "material" does not depend upon whether they concern specific transactions. Nor is it necessary that the facts be of such a nature that they "greatly appreciate" the stock's value. We adhere to the test stated by the Second Circuit Court of Appeals in the landmark *Texas Gulf Sulphur* decision: whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question. 401 F.2d at 849. *See also* Northwest Paper Corp. v. Thompson, 421 F.2d 137, 138 (9th Cir. 1970); Securities and Exchange Commission v. Great American Industries, Inc., 407 F.2d 453, 459–460 (2d Cir. 1968), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); List v. Fashion Park, Inc., 340 F.2d 457, 461–463 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1966).

■ To apply this standard, it is necessary to identify what facts, if any, were not disclosed by defendants to the Arbers before Essex' purchase of the Arbers' shares of stock and to assess the significance, from a reasonable person's viewpoint in the context of the

1961 sale, of any nondisclosures. Appellants contend that defendants did not disclose the following facts: (1) the role of Essex management in controlling an "administered price;" (2) the personal interest of Probst and Essex management in the transaction; (3) the book value of the stock, which appellants allege, was more than double the amount offered; and (4) other material facts concerning the earnings and corporate activity and plans of Essex.

The crux of the first contention is that before Essex "went public" there was no competitive market for Essex shares, and the price at which the stock was sold by the Arbers, referred to by management as the "going price", was in fact established by management. We observe, however, that appellants were aware that Essex was a closely-held corporation, that its stock was not widely traded, and that they were selling to Essex itself, or to Probst, its president. Appellants also knew that if Essex ever went public, the increased marketability of the shares would likely increase their value considerably. A reasonable inference, though not one completely clear from the record, is that appellants did know that the "going price" was set by management. Moreover, the district court expressly found that the going price "was arrived at after consideration of all relevant factors bearing on fairness, including the company's strengths and weaknesses and at what price knowledgeable persons . . . would sell." Indeed, the court found, on the basis of expert testimony, that the "going price" received by the Arbers was a "fair and reasonable" assessment of value at that time. This conclusion was reinforced by the stipulated existence of contemporaneous transactions between Essex and other sellers with extensive business experience and with knowledge of all available facts. They accepted the identical price received by the Arbers.[5] In this context, we do not

5. In their brief appellees set forth stipulated facts establishing both that the Arbers received the highest price paid up to the date of sale for their stock and that sellers with the most complete knowledge of Essex' operations, the company's own executives, made contemporaneous sales at the very same price:

| | Sale Date | Seller | Purchaser | Number Of Shares | Price Per Share |
|---|---|---|---|---|---|
| | 2/23/60 | Roesler | Egger & Co.* | 100 | $250 |
| | 6/07/60 | Shea | Mike & Co.* | 6,000 | $350 |
| | 12/23/60 | A. F. Kammer, Jr. | International Wire * | 1,370 | $350 |
| | 1/03/61 | Holton | Various Essex Employees | 950 | $350 |
| | 2/03/61 | Taft | Egger & Co.* | 40 | $350 |
| | 2/21/61 | Holton | Hirschman | 50 | $350 |
| | 3/28/61 | Roesler | Egger & Co.* | 75 | $350 |
| Arber Sale | 5/06/61 | Arber | Essex | 525 | $350 |
| | 6/02/61 | Holton | Harrison | 29 | $350 |
| | 6/02/61 | Holton | N. C. Kennedy and M. E. Kennedy | 150 | $350 |
| | 7/20/61 | Probst | Egger & Co.* | 72 | $350 |
| | 2/12/62 | Roesler | Gunn & Co.* | 75 | $375 |
| | 9/27/62 | Probst | Various Essex Employees | 2,925 | $400 |

\* Nominees of Essex

It is uncontroversted that each of the above sellers had full knowledge of all available facts regarding Essex. In addition to President Probst, the other sellers occupied the following positions:

(a) *Roesler* was Essex' Treasurer and chief financial officer in charge of preparing all financial statements and information. Mr. Roesler was thoroughly familiar with all details of stock purchases by Es-

think that detailed knowledge of the precise mechanism for establishing the "going price" would have affected the choice of action of a reasonable person in the position of the Arbers.[6]

The second contention, that of an undisclosed personal interest of Probst and Essex management in the transaction, hinges essentially on appellants' assertion that there existed a concealed plan of Essex and Probst, a major shareholder, for Essex to repurchase its own shares at a price less than book value for the purpose of increasing the value of all outstanding shares. The district court expressly found that appellants failed to prove the existence of such a plan.

■ Appellants also claim that appellees did not disclose book value which was substantially greater than the offer price, and other financial data such as earnings per share. This information, however, was readily available to appellants who, although aware of its existence and availability, were simply uninterested. We hold that an insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available; the outsider has knowledge that it is available and makes no inquiry; and the information thus available is not of an unusual or extraordinary nature.

Not only was this information available upon request but also, here, Probst informed plaintiffs that the company was doing well, and, perhaps more importantly, Ralph Arber provided them with his opinion of the company's potential from his perspective as a past employee and present competitor of Essex. He believed that Essex had excellent prospects for the future and, in advising Bertha Arber not to sell, told her that Essex was a "helluva company" and a "gung-ho outfit", that it was "going to go a long way" because of its competent and aggressive management, and that if the stock ever went public it would be very valuable.

■ Appellants argued, but did not prove, that at the time of the sale, management had definite plans reasonably

---

sex and was personally involved in virtually every transaction because as Treasurer he raised the money for each purchase.

(b) *Shea* was a director and Vice-Chairman of the Board of Essex. In June of 1960, Mr. Shea sold his entire holdings in Essex—6,000 shares—for the same $350 per share price received by the Arbers. (App. 47.)

(c) *Holton* was the founder, Chairman of the Board and Chief Executive Officer of Essex and held the controlling stock ownership interest in the Company.

(d) *A. F. Kammer* was a director and the son-in-law of Holton. Mr. Kammer received full financial information concerning Essex. (App. 47).

(e) *Taft*, a prominent lawyer who was and still is the senior partner in the 50-lawyer Boston firm of Herrick, Smith, Donald, Farley and Ketchum, had been an independent outside director for many years. Mr. Taft was a corporation lawyer, and a trustee for other shareholders in Boston. He acquired none of his shares under any Essex stock purchase plan.

As a director Mr. Taft received complete financial information. (App. 47.)
Brief for appellees at 12–13.
We observe that the officers and directors of Essex sold their stock both to Essex itself and to Essex employees and other individuals.

6. The cases relied upon by appellants, Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed. 2d 741 (1972), and Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970), are inapposite here. In both of those cases the defendant acted as an agent for plaintiffs' purchase or sale of stock while, at the same time, the defendants did not disclose that they were making a market in the stock for their own benefit. In *Ute*, for example, the Court expressly observed that the record revealed "a misstatement of a material fact, within the proscription of Rule 10b–5(2), namely, that the prevailing market price of the . . . shares was the figure at which [defendants'] purchases were made." 406 U.S. at 152, 92 S.Ct. at 1471.

certain to increase the value of the stock. We do not suggest that a fixed plan of future corporate activity may never be viewed as a material fact. Mere speculation, however, does not provide any basis for Section 10(b) liability. Certainly developments *subsequent* to the 1961 sale greatly increased the value of the Essex stock and no doubt the Arbers' sale of their shares proved improvident by hindsight. But Section 10(b) does not require that an insider "confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guesses or predictions." *Texas Gulf Sulphur Co., supra,* 401 F.2d at 848. In short, the law mandates disclosure only of existing material facts. It does not require an insider to volunteer any economic forecast.

We hold that appellees did not fail to disclose any material inside information. We do not find it necessary, therefore, to decide whether the district court's alternative finding that appellants would not have relied on any facts claimed to have been undisclosed is supported, and, if so, what its legal significance would be under Section 10(b).[7]

■ We also hold that appellants have not proved their claim of violation of state law. The district court did not specifically decide whether Michigan law or Indiana law was controlling, for it held that appellants' evidence was insufficient to establish fraud under the case law in either jurisdiction. We agree. Buckley v. Buckley, 230 Mich. 504, 202 N.W. 955 (1925); Bollstrom v. Duplex Power Car Co., 208 Mich. 15, 175 N.W. 492 (1919); Board of Commissioners of Tippecanoe County v. Reynolds, 44 Ind. 509, 15 Am.Rep. 245 (1873); Lebeis v. Rutzen, 289 Mich. 1, 286 N.W. 134 (1939). Neither state provides a broader cause of action in cases of nondisclosure than that provided by Section 10(b).

■ There remains to be considered appellants' claim that they were denied their Seventh Amendment right to jury trial. The district court struck the jury demand, reasoning that "[i]nasmuch as plaintiffs pray for rescission of the sale of the shares of stock, the Court must conclude that equitable relief is sought." Appellants rely upon Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), for the proposition that where legal and equitable claims are asserted in a single action, the right to trial by jury of the issues presented in the legal claim cannot be denied just because their determination is also necessary in the determination of the equitable claims. And, appellants contend that in addition to their

---

7. In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the United States Supreme Court held:

> Under the circumstances of this case, involving primarily a failure to disclose, *positive proof of reliance is not a prerequisite to recovery.* All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384 [90 S.Ct. 616, 621, 24 L.Ed.2d 593] (1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (CA2 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969); 6 L. Loss,

Securities Regulation 3876–3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud—SEC Rule 10b–5, §§ 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. Chasins v. Smith, Barney & Co., 438 F.2d 1167, at 1172 [2 Cir.].

406 U.S. at 153–154 (emphasis added). This, of course, makes clear that the Record in a 10b–5 action for nondisclosure need not contain an affirmative demonstration of plaintiffs' reliance. But we need not decide whether an affirmative showing by defendants that plaintiffs would not have relied might defeat an otherwise valid claim.

claim for rescission, admittedly equitable in nature, they requested alternative relief in the form of money damages, incidental damages for dividends and distributions attributable to the Essex stock, and punitive damages, all of which, appellants argue, are legal claims entitling them to trial by jury.

We agree with the general proposition that appellants derive from *Beacon* and *Dairy Queen*. But appellants' contention that their complaint contained legal, and not merely equitable claims for relief must be examined in the context in which the jury demand was stricken. Before the demand was stricken, the district court had dismissed the federal 10b–5 claim for want of jurisdiction, 342 F.Supp. 1162, and appellants were proceeding solely under Ohio law, which required an election between legal and equitable proceedings. Frederickson v. Nye, 110 Ohio St. 459, 144 N.E. 299 (1924); Baird v. Howard, 51 Ohio St. 57, 36 N.E. 732 (1894). A federal court in a common law diversity action, the context of the suit at the time the jury demand was stricken, would enforce such an election. Berger v. State Farm Mutual Automobile Insurance Company, 291 F.2d 666 (10th Cir. 1961). *See also* Myzel v. Fields, 386 F.2d 718, 740 n.15, (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Therefore, we hold that the district court properly concluded that appellants had elected to proceed in equity and, accordingly, there was no right to a jury trial at the time the demand was stricken. Because appellants requested the equitable remedy of rescission and were bound by Ohio's election of remedies doctrine, they could not simultaneously assert a claim for legal relief. For this reason, *Beacon* and *Dairy Queen* are simply inapposite here.

The conclusion that appellant had elected to proceed solely in equity is not in conflict with the third amended complaint. The complaint prayed for the rescission of the sale and delivery of the original shares to Arber and Broek, plus dividends and other distributions since 1960, and for punitive damages; in the alternative, it asked for a judgment equal to the difference between the amount paid for the stock and its current market value, plus dividends and distributions attributable to the stock, and punitive damages. It is evident that appellants' alternative claim did not request a traditional measure of damages at law, which would be the difference between what was received by appellants and the fair market value of the shares of stock at the time of the sale. *E.g.*, Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y.1967). *But cf.* Myzel v. Fields, *supra*, 486 F.2d at 740–742. Instead, appellants requested the monetary equivalent of rescission, equal to the difference between the sale price and the current market value of the stock. This request, as well as the request for the monetary equivalent of dividends and distributions on the stock, is of an equitable nature. Finally, assuming but not deciding that the claim for punitive damages was permissible under Ohio law, we observe that many courts have awarded punitive damages in equity, as well as at law. 48 A.L.R.2d 947, 955 (1956).

But for the election under operation of state law and the fact that the federal claim had been stricken, we would regard the claim of abridgment of the right to trial by jury as presenting a substantial question, because, the test for whether a jury right exists under *Beacon* and *Dairy Queen* is not if the claim in question is "primarily" legal or equitable in nature, but whether the claim could have been brought at law. There is even the possibility that appellants' Seventh Amendment claim might have been revived during the course of the trial, when the court, on the basis of "newly discovered evidence", explored reconsideration of the federal 10b–5 claim, because at this stage of the proceedings, appellants were not bound to an election by operation of state law. If

appellants had then reasserted their jury demand,[8] the dispositive question would have been whether appellants' alternative claims for monetary damages could have been brought at law.

For example, if the only remedy sought by appellants was rescission, it is clear there would be no right to jury trial. Richland v. Crandall, 259 F.Supp. 274, 276 n.1, (S.D.N.Y.1966). It is equally clear that a claim for compensatory damages would have given rise to a right to jury trial. Dasho v. Susquehanna Corporation, 461 F.2d 11 (7 Cir. 1972). As we have indicated above, however, appellants' request for monetary damages is not for traditional compensatory damages because it sought an amount equal to the value of rescission. We observe that one court has held that relief similar to that sought by appellants here in their alternative claim, termed by the court as "recisional damages", was a legal claim to which attached a right to trial by jury: Myzel v. Fields, *supra,* 386 F.2d, at 740–742. But we find it unnecessary to resolve here the question whether appellants' claim for monetary relief could have been brought at law, because even if legal issues were raised in the 10b–5 claim, appellants' contention that their Seventh Amendment rights were violated cannot prevail.

 When new legal issues arise during the course of a nonjury trial, they can certainly be determined by the court with the express or implied consent of the parties. Scholl v. Scholl, 80 U.S. App.D.C. 292, 152 F.2d 672 (1945); Fidelity and Deposit Co. v. Krout, 157 F.2d 912 (2d Cir. 1946); Smith v. Cushman Motor Works Co., 178 F.2d 953 (8th Cir. 1950). *See generally* 5 Moore's Federal Practice § 38.41, 329 (1971). Here appellants' counsel not only failed to suggest to the court that the revived federal claim raised new legal issues, but also appears to have agreed to trial by the judge alone of all issues on the 10b–5 claim.

This acquiescence is found in several colloquies between the court and appellants' counsel. During trial, the court specifically asked counsel if he would be able to introduce evidence on the federal claim for the court's consideration:

"THE COURT: All right, let's just for a minute—and I realize it is late, but so we can proceed right on. I am inclined, gentlemen, in order that I can review the case in its proper perspective and also take another look at the jurisdictional question that we passed on previously, I am inclined to consider a reopening—to reconsider the action that was dismissed by this Court. And to the extent that it would be reopened, if counsel wish to introduce evidence, I would like to make a complete record and reexamine that question in light of all the evidence in this case. If the Court states to counsel that it would reconsider reopening—reinstating, rather—the cause of action that was dismissed, are you in a position to introduce your evidence and complete your evidentiary presentation based on that decision?

"MR. STILLMAN: Yes, we are, your Honor."

And at the close of the evidence, the court made clear, again, that it desired to consider evidence and argument on the federal claim:

"Now, the matter of the Federal cause of action is still open. I have heard evidence on that matter. I would ask that in your briefs you address yourselves to that question as well, for after submission of the briefs and the arguments I may decide to reinstate that Federal cause of action and decide the merits on both causes of action, or in my final judgment I might reaffirm my original position and proceed to decide solely the

---

8. Since no effort was made to do so, we find it unnecessary to decide whether a jury demand could have been asserted without leave of the court. *See* Fed.R.Civ.P. 38.

State claim. So I would suggest that counsel address themselves to that as well."

Since the court thus advised appellants' counsel that it might reconsider its previous determination about federal jurisdiction and reinstate the federal claim, it was not further obligated, *sua sponte*, to impanel a jury. Appellants have not directed our attention to any objection to the court's procedure concerning the federal claim, either at trial or in the post-trial briefs and we have found none. From all that appears, we conclude that any right to consideration by a jury of any legal claims that might have arisen during the trial was waived.

There is a further reason for rejecting appellants' Seventh Amendment claim. Appellants' proof, in our view, failed to raise issues of fact sufficient to go to the jury. Although the trial court made no such finding because it was not required to do so, we conclude from an examination of the record that reasonable men could not differ on the proposition that defendants did not fail to disclose any material inside information. Northwest Paper Corp. v. Thompson, 421 F.2d 137 (9th Cir. 1969). *See also* Whitsell v. Alexander, 229 F.2d 47, 49 (7th Cir. 1956).

Because our determinations on the foregoing issues are dispositive, we do not consider whether the district court correctly held that the 22 month delay between the date appellants learned from the prospectus that the Essex stock was "going public", at a price greatly in excess of the amount received by appellants in the 1961 sale, and the date they instituted this action, during which time the value of the stock appreciated by sixty percent, constituted laches barring appellants' claims for rescission. *See* Keyerleber v. Euclid Congregation of Jehovah's Witnesses, 103 Ohio App. 423, 143 N.E.2d 313 (1957); Estate Counseling Service v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527 (10th Cir. 1962); Baumel v. Rosen, 412 F.2d 571, 574 (4th Cir. 1969).

Judgment affirmed.